**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DERRICK J. JOHNSON and F & J HOLDINGS, )
INC., and CHARLES THOMPSON, )
                      )
          Plaintiffs, )
                      )
PITTSBURGH BAKER'S DOZEN, INC. and )
EDWARD GANDY, )
                      )
      Intervening Plaintiffs, )
                      )
    v. )
                      )    Civil Action No. 11-1117
DUNKIN' DONUTS FRANCHISING L.L.C., aka )    Judge Nora Barry Fischer
DONKIN' BRANDS, INC., aka DUNKIN' )
DONUTS, )
                      )
          Defendant. )

## MEMORANDUM OPINION

I.      INTRODUCTION

       This action involves claims of race discrimination and promissory estoppel arising from

Plaintiffs Derrick J. Johnson, his entity, F & J Holdings, Inc., Charles Thompson, (collectively,

"Plaintiffs") and Intervenor Plaintiffs Pittsburgh Bakers Dozen, Inc. ("PBD") and Edward

Gandy's (collectively "Intervenor Plaintiffs") failed investments in renovating two buildings for

the purpose of starting a donut commissary in the Pittsburgh area. (Docket Nos. 16, 27). They

allege that they made the investments in the donut commissary in order to support a contractual

relationship between PBD and Defendant Dunkin' Donuts ("Dunkin'"), making PBD an

approved supplier to produce fresh donuts for Dunkin's local Pittsburgh franchisees. (*Id.*).

Plaintiffs and Intervenor Plaintiffs contend that the contractual relationship was part of a broader

Pittsburgh Supply Plan under which City of Pittsburgh officials and members of the Urban

Redevelopment Authority ("URA") worked with Dunkin' to locate the donut commissary in an

underdeveloped, minority-populated area of Pittsburgh. (*Id.*). They argue that Dunkin' unilaterally terminated the Pittsburgh Supply Plan as a result of the discriminatory motives of its franchisee, Heartland Coffee Company, and thereby breached certain promises to the Plaintiffs and committed race discrimination. (*Id.*).

Presently before the Court are Dunkin's motions to dismiss the amended complaints filed by Plaintiffs and the Intervenor Plaintiffs. (Docket Nos. 25, 31). The motions have been fully briefed and oral argument was held as to such motions on May 7, 2012. (*See* Docket Nos. 26, 28, 32, 33, 36, 37, 38). For the following reasons, Dunkin's motion to dismiss Plaintiffs' amended complaint [25] is granted and Dunkin's motion to dismiss Intervenor Plaintiffs' amended complaint [31] is granted, in part, and denied, in part.

II.     FACTUAL BACKGROUND[1]

As is noted above, Plaintiffs Johnson, Thompson and F & J and Intervenor Plaintiffs PBD and Gandy filed separate amended complaints against Dunkin'. (Docket Nos. 16, 27). The factual allegations set forth in these pleadings are largely the same as the Intervenor Plaintiffs have expressly incorporated many of the pertinent allegations made by Plaintiffs in their Amended Complaint, to the extent that such allegations are not inconsistent with their own allegations. (*See* Docket No. 27 at ¶ 3 ("Gandy and PBD incorporate by reference the following Paragraphs of the Plaintiffs' Amended Complaint: Paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 15, 17 through 69, and 75 through 90 except to the extent inconsistent with averments contained herein.")). To the extent that there are differences between the pleadings, the same are noted below.

*A.  The Parties*

---

[1]     In evaluating a Motion to Dismiss, this Court must accept the plaintiffs' well-pleaded allegations as true and construe them in their favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009).

Dunkin' is a national franchisor of retail food establishments, headquartered in Massachusetts. (Docket No. 16 at ¶ 12). "Dunkin' develops and franchises retail stores that sell Dunkin' Donuts coffee, donuts, bagels, muffins, compatible bakery products, sandwiches and other beverages." (Docket No. 27 at ¶ 6). Dunkin's franchise agreements allegedly require that its franchisees only sell and source products from its approved suppliers. (*Id.* at ¶ 7-8). Dunkin' was purchased in 2006 by three equity capital firms which then allegedly began an extensive expansion of its franchise operations within the United States, including, among other areas, the Pittsburgh market. (Docket No. 16 at ¶ 12). As a part of this expansion into Pittsburgh, Dunkin' sought to establish relationships with potential suppliers in the Pittsburgh region to produce its products which were to be sold at the new franchise locations. (Docket No. 27 at ¶ 9).

PBD is a Pittsburgh-based entity owned by sole shareholder Edward Gandy and operated, in part, for the purpose of becoming an approved supplier of Dunkin' products and producing approved donuts and baked goods for local franchisees of Dunkin'. (*Id.* at ¶¶ 1-2). PBD and Gandy were assisted in their efforts for PBD to become an approved Dunkin' supplier by two independent contractors, Derrick J. Johnson and Charles Thompson. (Docket No. 16 at ¶¶ 9, 10). An entity owned and operated by Johnson, F & J Holdings, was created in July 2007 for the express purpose of purchasing PBD from Gandy. (Docket Nos. 16 at ¶¶ 10, 68; 27 at ¶¶ 4, 5). Gandy, Johnson and Thompson, are all African American businessmen in the Pittsburgh area. (Docket Nos. 16 at ¶¶ 9, 11; 27 at ¶ 2).

Although it is not named as a party in this action, Heartland Restaurant Group, LLC, f/k/a Heartland Coffee Company was also involved and is described as Dunkin's largest franchisee in the Pittsburgh area. (Docket No. 16 at ¶ 15).

*B. The Pittsburgh Supply Plan & Initial Negotiations*

During 2006, Dunkin' and most of the plaintiffs (including PBD, Gandy, Johnson, & Thompson) entered into negotiations concerning what became known as the Pittsburgh Supply Plan – the purpose of which was to establish an approved bakery manufacturer for Dunkin's products which would supply and support its franchisees in the Pittsburgh area. (Docket No. 27 at ¶ 10). These plaintiffs maintain that there was an underlying social purpose of the Pittsburgh Supply Plan to bring jobs and prosperity to Homewood, an area of the City with a large minority population and also a high number of individuals who were unemployed or held low income jobs. (Docket No. 16 at ¶ 16). Thompson was the lead negotiator on behalf of PBD given his prior experience in securing contracts with UPMC and the City of Pittsburgh School District. (Docket No. 16 at ¶¶ 19, 21). Representatives from the City of Pittsburgh and the URA were also involved in these negotiations. (*Id.* at ¶ 17; Docket No. 27 at ¶ 10). (In addition, Gandy alleges that he borrowed $100,000.00 from the URA for the project). (Docket No. 27 at ¶ 15).

All of the plaintiffs allege that the Pittsburgh Supply Plan included, among other things, Dunkin's plan to build two commissaries in the Pittsburgh area – one in the east and a second in the west. (Docket No. 16 at ¶¶ 13-16). PBD was ultimately selected to operate the east commissary while Lok Bakeries was selected to operate the west commissary. (*Id.* at ¶ 18). Plaintiffs aver that their understanding of the Pittsburgh Supply Plan was that Dunkin's local franchisees would be contractually required to purchase Dunkin' products for sale in their stores from the two commissaries – which would be the exclusive suppliers of such goods in the area. (*Id.* at ¶¶ 23-24).

The parties engaged in extensive discussions throughout 2006 in order to negotiate the contract and foster business relationships. (*Id.* at ¶17). Johnson traveled to Detroit in September 2006, and met with one of Dunkin's consultants, Jim Green, of Jim Green and Associates. (*Id.* at

¶ 31). At that meeting, they toured a commissary and Green showed Johnson how it operated. (*Id.*).

*C. Formation of Approved Bakery Manufacturing Agreement between Dunkin and PBD*

Dunkin and PBD entered into an Approved Bakery Manufacturing Agreement ("ABMA")[2], effective December 31, 2006, which was executed by Gandy on behalf of PBD in December of 2006 and by a Dunkin' representative on January 4, 2007. *See ABMA*. The initial term of the ABMA is for ten (10) years to end on December 31, 2016 with an automatic renewal term of an additional ten (10) years if certain conditions specified in the ABMA were met. *Id.* at 2. As set forth in the Recitals portion of the ABMA, the stated purposes of the contract were that:

- Dunkin' "desires to designate an approved supplier that will manufacture and deliver approved baked goods and other products to Dunkin Donuts branded stores (the "Stores") from time to time designated by [Dunkin]. Most stores are independently owned and operated by [Dunkin's] franchisees."

- PBD "agrees to serve as such a supplier in accordance with the terms of this Agreement."

*Id.* The ABMA remarkably makes no mention of the fact that PBD did not have a facility at which to manufacture such products at the time of execution. It also contains no agreements, covenants, representations or warranties among the parties regarding the construction of such a facility. In all, the ABMA is silent as to construction of a commissary facility by PBD or any other person or entity. Instead, the focus of the ABMA is on PBD's manufacture of Dunkin'

---

[2] Dunkin' attached the ABMA to both of its motions to dismiss. (*See* Docket Nos. 26-1; 32-1). For consistency, the Court will cite to same as "ABMA". As is discussed in § IV., *infra*, the Court may consider a document outside the pleadings on a motion to dismiss if it "forms the basis of a claim." *See Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

products in accordance with Dunkin's specifications and the supply of same to Dunkin' franchisees. To this end, the Agreement contained certain limitations, including that:

> E. Manufacturer [PBD] acknowledges that Manufacturer is granted no exclusive territory or service area under this Agreement.

> F. Manufacturer [PBD] acknowledges and agrees that Franchisor [Dunkin'] has made no commitment on its own behalf or on behalf of its franchisees to purchase, distribute, or to cause to be purchased or distributed any minimum amount of Products [donuts] or that Manufacturer's revenue will increase by a specified amount or percentage. To the extent that Franchisor may have provided Manufacturer with historical or estimated Product volumes, Franchisor will not be liable if Manufacturer's actual sales are less than the amount stated in such data, forecasts or projections.

*ABMA*, § 2, ¶¶ E and F. Additional provisions include an integration clause that states:

> This Agreement sets forth the entire understanding of the parties in connection with the subject matter hereof. No party has made or relied on any statement, representation or warranty in connection herewith except as expressly set forth herein. This Agreement may only be modified in writing and signed by both parties.

*Id.* at § 25. A provision entitled "No Third Party Beneficiaries," provides that:

> Nothing in this Agreement shall be construed to give any person or entity other than the parties hereto any legal or equitable claim, right or remedy; rather, this Agreement is intended to be for the sole and exclusive benefit of the parties hereto.

*Id.* at § 24.

The parties further stipulated that the ABMA was governed by Massachusetts law and that the parties specified that they would engage in alternative dispute resolution prior to initiating litigation, including mediation in Boston and if unsuccessful, arbitration. *Id.* at § 19. If

litigation was necessary, they agreed that neither party would object to venue in Boston or Harrisburg, Pennsylvania.[3] *Id.*

### D. Continuing Correspondence / Meetings

A meeting was held on February 15, 2007 between plaintiffs and a host of representatives of Dunkin and its consultants, including: Chris Powers, Manager of Manufacturing; Paul McFarlane, Manager of Manufacturing; Allen Leonard, Construction and Engineering Manager; Troy Volk, Manufacturing; Anthony Braun, Operations Manager; Jim Green; Fred Rheaume, Manufacturing Development Manager; and, Joe Koudelka, Director of Manufacturing. (Docket No. 16 at ¶¶ 25-33). The purpose of the meeting was to "achieve a clear understanding of what must be done and how it will be done to meet the demand plan for the Pittsburgh, PA market, specifically, who will do what and when." (*Id.* at ¶ 34). They also discussed, among other things, future development plans, market strategy, PBD's relationship with the city, execution planning, engineering and construction, building location; construction timelines; etc. (*Id.* at ¶ 35). Mandatory meetings were held every Thursday thereafter. (*Id.* at ¶ 36). Numerous smaller meetings were held. (*Id.* at ¶ 37). Indeed, Thompson had almost daily telephone conversations with Green. (*Id.* at ¶¶ 41-42). Plaintiffs also allege that Dunkin', through its representatives and agents, required Plaintiffs to not correspond with any third parties without receiving prior approval of the communications. (*Id.* at ¶¶ 38, 39).

### E. Homewood Site & Alleged Race Discrimination

The initial site for the PBD commissary was 6947 Kelly Street, Homewood, Pennsylvania, 15208. (Docket No. 16 at ¶ 43). Plaintiffs and Intervenor Plaintiffs maintain that this building met all specifications that were previously communicated to them by Dunkin'. (*Id.*

---

[3] There has been no objection to Plaintiffs' choice of venue in this District by Defendant. In addition, counsel advised at the motion hearing, (*see* Docket No. 38), that a pre-litigation mediation was held between the parties in Pittsburgh.

at ¶ 46). They aver that Dunkin's franchisee Heartland inspected the Homewood property in May of 2007. (*Id.* at ¶ 43). They contend that an unnamed Heartland representative made "unwelcome comments" about the commissary and neighborhood to Johnson, allegedly because he was African American, as were his associates and many of the other individuals in the neighborhood. (*Id.* at ¶ 44). Plaintiffs maintain that shortly after this visit, Thompson received a call from Green, who advised that "there is a problem, Heartland does not like the building. How can we solve it?" (*Id.* at ¶ 45). An unnamed representative of Dunkin' allegedly told Thompson that Heartland had an issue with the location because of the predominantly African American population in the area and its beliefs that it could not sell donuts in that area. (*Id.* at ¶ 48).

As a result, Dunkin's representatives, Green, Volk and Leonard advised Johnson and Thompson to explore new locations for the commissary. (*Id.* at ¶¶ 49-50). All of the plaintiffs contend that by taking such action, Dunkin' "tacitly approved" Heartland's race discrimination. (*Id.* at ¶ 47).

### F. Braddock Site

As directed, Thompson found a new location for the projected commissary at 333 Braddock Avenue, Braddock, PA. (*Id.* at ¶ 50). Dunkin's representatives, Rheaume and Leonard, inspected the facility on May 23, 2007 to assess the "pros and cons" and the risks of the site. (*Id.* at ¶ 51). At this time, they instructed Johnson: to buyout Edward Gandy's stock in PBD; purchase a lease on the site; and retain an architect for construction of the facility. (*Id.* at ¶¶ 52, 53). Dunkin' representatives also provided Plaintiffs with boilerplate letters to send to Heartland, which in turn signed a third party management agreement and/or purchase commitment with PBD. (*Id.* at ¶¶ 55, 66).

Pursuant to the direction of Dunkin', the lease was executed by PBD at the site and demolition work quickly commenced. (*Id.* at ¶ 55). Plaintiffs also retained John Anthony of Robert L. Kimball & Associates to provide architectural services. (*Id.* at ¶¶ 53, 54). On June 6, 2007, Plaintiffs Johnson and Thompson attended a planning meeting with Heartland representatives Edward Jaten, President/C.E.O. and Michael Orie, V.P. – Real Estate, as well as consultant, Chuck Powel of the URA and Ken Cuccaro of Cuccaro Construction Co. (*Id.* at ¶ 56). During the meeting, Jaten confirmed that Cuccaro Construction was prepared to begin construction and that the URA of Pittsburgh was involved. (*Id.* at ¶¶ 57, 58). He then approved the building of the commissary in Braddock. (*Id.* at ¶ 59). After the meeting, on June 13, 2007, Dunkin' representative Leonard provided specifications for the Braddock commissary to Anthony, Plaintiffs' architect. (*Id.* at ¶ 54). Architectural drawings were completed and the work on the site continued. (*Id.* at ¶ 61).

In June 25, 2007, Dunkin' Operations Manager Braun and three assistants visited 333 Braddock to oversee construction. (*Id.* at ¶ 60). They visited for such purpose on at least three occasions. (*Id.*). Work continued without any objections from Dunkin'. (*Id.* at ¶ 64). However, on August 20, 2007, certain correspondence between Green, Volk and Powers, indicated that Dunkin' was "thinking" about the disposition of business under the Pittsburgh Supply Plan. (*Id.* at ¶ 62). Then, in early September 2007, Dunkin' representatives Volk, Powers, Rheaume, Leonard and McFarlane telephoned Plaintiffs and advised that "it's over" – "we are going in a different direction. How can we resolve this problem? It's our fault, we are sorry. How can we resolve it?" (*Id.* at ¶ 63). All of the plaintiffs allege that prior to this telephone conference, they had no notice that the deal was in jeopardy, let alone over. (*Id.* at ¶ 64).

They also maintain that there was no business reason to terminate the relationship. (*Id.* at ¶ 89). However, they concede that they were advised that the relationship was terminated because Dunkin' decided to "switch from fresh donuts to frozen donuts" – which presumably did not require the building of a commissary in Braddock. (*Id.*). It is unclear from Plaintiffs' Amended Complaint whether they claim that the deal as it pertained to the Braddock site was cancelled for discriminatory reasons. (*See* Docket No. 16). However, the Intervenor Plaintiffs affirmatively allege that the Pittsburgh Supply Plan was terminated "because [Heartland] objected to being required to purchase [donuts and other baked goods] manufactured by the African American Community, including Gandy." (Docket No. 27 at ¶ 16).

### G.  Attempted Purchase of PBD by F & J

Plaintiffs allege that in May of 2007, Dunkin' instructed Johnson and Farhad Salari Lok (the owner of the west commissary under the Pittsburgh Supply Plan) to buy out Gandy's shares of PBD and to pay all of PBD's debts in full. (Docket No. 16 at ¶ 67). Intervenor Plaintiffs plead that Dunkin' only "suggested" that they make the acquisition. (Docket No. 27 at ¶ 4). To this end, and due to certain tax and financial issues, Johnson formed "F & J" in July of 2007. (Docket No. 16 at ¶ 68). Lok was initially a part of F & J but he withdrew from same on August 7, 2007. (*Id.* at ¶ 72). F & J never consummated the purchase of PBD. (*Id.* at ¶ 69; Docket No. 27 at ¶ 5). The Intervenor Plaintiffs allege that the terms of the deal with F & J included: F & J paying $400,000.00 to Gandy for his stock; $100,000 cash; and F & J paying the URA $100,000.00 to satisfy Gandy's debt to the URA. (*Id.* at ¶ 15).

### H.  Alleged Promises

Plaintiffs Johnson, Thompson and F & J acknowledge that PBD entered into the ABMA with Dunkin. (*Id.* at ¶ 22). However, they point out that they are not parties to that agreement

and never entered into any written agreements with Defendant. (*Id.* at ¶¶ 73). They claim that Dunkin' made a "series of promises and orders" to them, which they relied on to their financial detriment. (*Id.* at ¶¶ 74, 76). Plaintiffs' Amended Complaint lacks specificity as to the precise promises that were made by Dunkin', but states that the "series of promises and orders" were made by Dunkin' "with the agreed upon goal of establishing a commissary for the purpose of producing fresh donuts." (*Id.* at ¶ 76). Plaintiffs allege that Dunkin' induced them to take reasonable actions such as to enter into leases and other agreements and renovating the commissaries. (*Id.* at ¶ 79). Plaintiffs contend that their actions were reasonable and that Dunkin's unilateral termination of the deal caused them to suffer financial harm including: construction bills; consulting fees; additional unspecified bills; time; lost profits; breached leases; as well as architect, construction and demolition costs. (*Id.* at ¶ 81). Specifically, Plaintiffs aver that they entered into agreements with Ken Cuccaro Construction; Berman Investment Group; Charles Thompson Consulting; Michael J. Howard – Roofing Contractor; Robert J. Kimball & Associates – Engineers; and Marco Remediation. (*Id.* at ¶ 82). Presumably, Plaintiffs have outstanding invoices with all of these entities. (*Id.*). Consequently, they seek an unspecified amount of damages from Dunkin'. (*Id.* at 13).

Intervenor Plaintiffs PBD and Gandy also acknowledge that PBD entered into the ABMA with Dunkin' and that PBD is bound by such agreement. (Docket No. 27 at ¶ 11). However, they also argue that they were promised that Dunkin's franchisees would be required to purchase donuts and other baked goods from PBD if a donut commissary was built according to Dunkin's specifications. (*Id.*). Intervenor Plaintiffs maintain that the east commissary was built based on their reasonable reliance on this promise. (*Id.* at ¶¶ 11, 12). They claim that the Pittsburgh Supply Plan was terminated because Dunkin's franchisee, Heartland "objected to being required

to purchase such goods manufactured by members of the African American community, including Gandy." (*Id.* at ¶ 16). Gandy also claims that the termination of the deal caused the proposed purchase of PBD by F & J to fall through, causing him further harm. (*Id.* at ¶ 14).

PBD and Gandy claim that their damages are $775,332.00 consisting of $89,320.00 of expenses for the commissary and $689,000.00 in debt they incurred related to same. (*Id.* at ¶ 14). Gandy claims that his damages from the failed acquisition were $500,000.00, which includes $400,000.00 for his stock, and $100,000 in cash as well as the debt satisfaction of $100,000.00 that he personally owed to the URA. (*Id.* at ¶ 15).

### III. PROCEDURAL HISTORY

Plaintiffs initiated this action by filing a Complaint against Dunkin' alleging promissory estoppel and race discrimination on August 31, 2011. (Docket No. 1). After service was made in November of 2011, Dunkin' sought an extension of one week to respond to the Complaint, which was granted by the Court, making its response due on January 13, 2012. (Docket Nos. 5, 6). In the interim, Intervenor Plaintiffs filed a motion to intervene in this case. (Docket No. 7). Counsel for Dunkin' advised the Court that it did not oppose the motion to intervene and the motion was granted on January 11, 2012. (Docket No. 10). Intervenor Plaintiffs then filed their Complaint, largely incorporating the allegations set forth by the Plaintiffs. (Docket No. 14).

Dunkin' responded to both Complaints by filing motions to dismiss. (Docket Nos. 11, 23). Plaintiffs and Intervenor Plaintiffs filed Amended Complaints and these initial motions to dismiss were denied by the Court, as moot. (*See Text Orders 2/7/12; 3/20/12*). Dunkin' has again moved to dismiss both Amended Complaints. (Docket Nos. 25, 32).

With respect to Plaintiffs' Amended Complaint, Dunkin' filed its motion to dismiss on March 8, 2012. (Docket Nos. 25, 26). Plaintiffs submitted their brief in opposition on March 28, 2012. (Docket No. 28). Dunkin' then filed its reply brief on April 11, 2012. (Docket No. 33).

Regarding Intervenor Plaintiffs' Amended Complaint, Dunkin' filed its motion to dismiss on April 10, 2012. (Docket No. 32). Intevenor Plaintiffs filed their response and brief in opposition on April 24, 2012. (Docket Nos. 36, 37). No reply brief was submitted.

Finally, given the overlapping nature of the allegations in the amended complaints and the legal theories raised in same, the Court held oral argument regarding both of the motions to dismiss on May 7, 2012. (Docket No. 38). The parties declined the Court's invitation to submit supplemental briefing addressing the matters raised during the hearing and the Court took the motions under advisement at that time. (*Id.*). As all briefing has concluded, the motions are now ripe for disposition.

IV.    LEGAL STANDARD

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) challenges the legal sufficiency of a complaint. The United States Supreme Court has held that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations and must draw all reasonable inferences therefrom in favor of the plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009); *Twombly*, 550 U.S. at 555. As the Supreme Court made clear in *Twombly*, however, the "factual allegations must be enough to raise a right to relief above the

speculative level." *Twombly*, 550 U.S. at 555. The Supreme Court has subsequently broadened the scope of this requirement, stating that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557). "This 'plausibility' determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949).

After *Iqbal*, the United States Court of Appeals for the Third Circuit explained that a district court must conduct the following analysis to determine the sufficiency of a complaint:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1947, 1950); *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011), *cert. denied*, 2012 WL 296904 (Apr. 2, 2012); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

*Twombly* and *Iqbal* have not changed the other pleading standards for a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), and the requirements of FED. R. CIV. P. 8 must still be met. *See Burch*, 662 F.3d at 220. Rule 8 requires a showing, rather than a blanket assertion, of entitlement to relief, and "contemplates the statement of circumstances, occurrences, and events

in support of the claim presented and does not authorize a pleader's bare averment that he wants relief and is entitled to it." *Twombly*, 550 U.S. at 555 n.3 (internal alterations, citations, and quotations omitted). The Supreme Court has explained that a complaint need not be "a model of the careful drafter's art" or "pin plaintiffs' claim for relief to a precise legal theory" so long as it states "a plausible 'short and plain' statement of the plaintiff's claim." *Skinner v. Switzer*, ---U.S. ---, 131 S. Ct. 1289, 1296 (2011); *see also Matrixx Initiatives, Inc. v. Siracusano*, --- U.S. ---, 131 S. Ct. 1309, 1322 n.12 (2011) (emphasizing that "to survive a motion to dismiss, respondents need only allege 'enough facts to state a claim to relief that is plausible on its face'") (quoting *Twombly*, 550 U.S. at 570)).

In deciding a Rule 12(b)(6) motion to dismiss, the Court may consider "only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.,* 361 F.3d 217, 222 n. 3 (3d Cir. 2004). A document forms the basis of a claim if it is *"integral to or explicitly relied upon* in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir. 1999) (emphasis in original; internal citations and quotations omitted).

V.     DISCUSSION

Dunkin' has moved to dismiss the promissory estoppel and race discrimination claims against it, with prejudice. (Docket Nos. 25, 26, 31-33). Plaintiffs and Intervenor Plaintiffs maintain that their claims are sufficiently pled to survive the instant motions to dismiss. (Docket Nos. 28, 36, 37). The Court will discuss the parties' arguments with respect to each cause of action, in turn.

A.  *Promissory Estoppel Claims*

The Court first addresses the elements of the promissory estoppel claims. The parties do not dispute that Pennsylvania law applies to these claims.[4] (Docket Nos. 25, 26, 28, 31-33, 36, 37). To maintain a promissory estoppel action under Pennsylvania law:

> [T]he aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute. Thus, as promissory estoppel makes otherwise unenforceable agreements binding, the doctrine sounds in contract law....

*Guerra v. Redevelopment Authority of City of Philadelphia*, 27 A.3d 1284, 1292 (Pa. Super. Ct. 2011) (quoting *Crouse v. Cyclops Industries,* 560 Pa. 394, 403, 745 A.2d 606, 610 (2000) (internal citation omitted)).

> Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment.

*Crouse v. Cyclops Industries*, 560 Pa. 394, 402-403, 745 A.2d 606, 610 (Pa. 2000) (citing RESTATEMENT (SECOND) CONTRACTS § 90; *Shoemaker v. Commonwealth Bank,* 700 A.2d 1003, 1006 (Pa.Super.Ct. 1997)).

### i. Dunkin's Contract Defense

---

[4]      As is discussed in further detail below, the written ABMA between PBD and Dunkin' includes a narrow choice of law provision under which the "Agreement" is to be interpreted under Massachusetts law. *ABMA* at § 19.B. The Court agrees with Dunkin's position raised at oral argument that this narrow clause does not make Massachusetts law applicable to the promissory estoppel claims in this case. *See Seltzer v. Dunkin' Donuts, Inc. et al*, Civ. A. No. 09-5484, 2011 WL 1532398, at *5 (E.D.Pa. Apr. 21, 2011) (noting that the broad choice-of-law provision in that case made Massachusetts law apply to any claims arising out of the contractual relationship). In any event, courts have recognized that the law of promissory estoppel in both Pennsylvania and Massachusetts is substantially similar. *See id.*

Dunkin' first argues that the written agreement in this case, the ABMA, precludes the promissory estoppel claims brought by both the Plaintiffs and the Intervenor Plaintiffs. (Docket Nos. 26, 32). In opposition, the individual plaintiffs (Johnson, Thompson and Gandy) and F & J maintain that they are not parties to the contract and, as such, this agreement cannot preclude their promissory estoppel claims against Dunkin'. (Docket Nos. 28, 37). PBD admits that it is a party to the agreement with Dunkin', but argues that its promissory estoppel claim relies on promises made to it by Dunkin' under the Pittsburgh Supply Plan – which it asserts is broader in scope than the supply agreement. (Docket No. 37 at 8-9).

> "Under Pennsylvania law, an enforceable contract between two parties precludes relief for a claim of promissory estoppel." *Isobunkers, L.L.C. v. Easton Coach Co.*, No. 09-879, 2010 WL 547518, at *4 (E.D.Pa. Feb.9, 2010) (citing *Carlson v. Arnot-Ogden Mem'l. Hosp.*, 918 F.2d 411, 416 (3d Cir.1990)). … Where an express contract governs the relationship of the parties, […], "a party's recovery is limited to the measure provided in the express contract." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir.1987).

*TES Franchising, LLC v. Dombach*, Civ. A. No. 10-17, 2010 WL 5071472, at *11 (E.D.Pa. Nov. 24, 2010).

"Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citing *Smith v. Commonwealth Nat. Bank*, 384 Pa. Super. 65, 557 A.2d 775, 777 (1989), *appeal denied*, 524 Pa. 610, 569 A.2d 1369 (1990)). The ABMA contains a narrow choice of law provision which states that the agreement shall be interpreted under Massachusetts law.[5] *See ABMA* at ¶ 19.D. Massachusetts courts have adopted Restatement

---

[5] Section 19.D., "Applicable Law" provides that "[t]his Agreement shall be construed under and shall be deemed governed by the laws of the Commonwealth of Massachusetts." *ABMA* at § 19.D. Neither party has argued that Massachusetts law should govern the claims in this case, which do not rely on breach of contract theories.

(Second) of Contracts § 302 (1981),[6] and hold that non-parties generally cannot enforce an agreement against another party unless such non-party is an "intended beneficiary" of the contract.[7]  *See Parker v. Bank of America, NA*, 2011 WL 6413615, at *7 (Mass. Super. 2011) ("Federal and Massachusetts law are not, however, greatly dissimilar on the question of when a contract confers rights on non-parties. To enforce the contract, the plaintiff must be an 'intended beneficiary.'").  In that jurisdiction, "[i]t must appear from 'the language and circumstances of the contract' that the parties to the contract 'clear[ly] and definite[ly]' intended the beneficiaries to benefit from the promised performance."  *Miller v. Mooney*, 431 Mass. 57, 61-62, 725 N.E.2d 545, 549-550 (Mass. 2000) (quoting *Anderson v. Fox Hill Village Homeowners Corp.,* 424 Mass. 365, 366-367, 676 N.E.2d 821 (1997)).

The terms of the ABMA are clear and unambiguous that the only parties to the agreement are Dunkin' and PBD.  *See generally ABMA*.  To this end, the recitals of the contract reflect that Dunkin' and PBD are the only parties.  *Id.* at 2.  The notice provision states that all notices shall be sent to these entities.[8]  *Id.* at § 16. And, significantly, the contract contains a provision

---

However, to the extent that interpretation of the same is necessary, reference to Massachusetts law is discussed herein.

[6]    Restatement (Second) of Contracts § 302 (1981) states:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

[7]    If Pennsylvania law were applied, we would reach the same result.  "[C]ourts have recognized that [under Pennsylvania law] plaintiffs cannot be third party beneficiaries where a contract specifically states that it is not intended to create third party beneficiaries at all."  *Tredennick v. Bone*, 647 F. Supp. 2d 495, 498 (W.D. Pa. 2007), *aff'd*, 323 F. App'x 103 (3d Cir. 2008).

[8]    The notice provision does not specify any representative or agent of PBD to whom notice should be sent but includes only the name of the corporation.  *ABMA* at § 16.  However, Gandy did execute the agreement on behalf of PBD as President and C.E.O. of the company.  *Id.* at 14.

expressly disclaiming that any intended beneficiaries were created by the contract. *Id.* at § 24. In this regard, § 24, entitled "No Third Party Beneficiaries" provides that:

> Nothing in this Agreement shall be construed to give any person or entity other than the parties hereto any legal or equitable claim, right or remedy; rather, this Agreement is intended to be for the sole and exclusive benefit of the parties hereto.

*Id.* Therefore, the terms and conditions of the ABMA "clearly and definitely" provide that the parties to the agreement were Dunkin' and PBD and these entities did not intend that any third party beneficiaries would be created by virtue of the ABMA. *See Miller*, 431 Mass. 57, 61-62. Consequently, no individual or entity aside from PBD could maintain a breach of contract action against Dunkin' as a third party beneficiary of the contract and, likewise, Dunkin' cannot assert that the mere existence of the agreement precludes Johnson, Thompson, Gandy or F & J from bringing their promissory estoppel claims against Dunkin' in this action. *See TES Franchising, LLC*, 2010 WL 5071472, at *11 (stating that a promissory estoppel claim will be precluded "[w]here an express contract governs *the relationship of the parties*" (emphasis added)). Other courts, including *Seltzer v. Dunkin' Donuts*, have recognized that a plaintiff's promissory estoppel claim is not barred by a contract to which the plaintiff is not a party. *Seltzer v. Dunkin' Donuts, Inc.*, 2011 WL 1532398, at *7 (E.D.Pa. Apr. 21, 2011) ("Although Dunkin' Donuts is correct that promissory estoppel claims cannot be maintained where the promised alleged is part of a binding contract between the parties, the Entity Plaintiffs were not parties to the SDA"). The same is true here. Accordingly, to the extent that Dunkin' contends that such claims must be dismissed on this basis, said motion to dismiss is denied.[9]

---

[9]    Dunkin' also argues that the promissory estoppel claims brought by Johnson and Thompson are barred under agency theory as both identify themselves as acting as "independent contractors" and/or "consultants" for PBD. (Docket No. 26). Plaintiffs counter that they have also alleged that they sustained injuries in their own right because each allegedly "funded liabilities" on behalf of PBD. (Docket No. 28). Although it is not specifically stated, Plaintiffs apparently entered into contracts with third parties as a result of the "promises and representations"

With respect to its promissory estoppel claim, PBD admits that it is a party to the ABMA but contends that this agreement does not preclude or preempt its claim. (Docket No. 37). PBD argues that the promises made by Dunkin' under the Pittsburgh Supply Plan to build commissaries in the Pittsburgh area were outside the scope of the ABMA which was limited only to the approval of PBD as a supplier and that the ABMA was an "executory contract"[10] under which neither party had performed and, thus, unenforceable. (*Id.*). For the reasons set forth in the following section discussing the "reasonable reliance" of PBD, the Court finds that PBD has sufficiently pled that Dunkin' made promises to it which were outside the scope of the ABMA, primarily, that if PBD built a commissary, Dunkin' would require its local suppliers to purchase Dunkin' products from PBD. (*See* Docket No. 27 at ¶ 11). As is discussed in the next section, this alleged promise supports a plausible promissory estoppel claim under Pennsylvania law. Accordingly, Dunkin's motion to dismiss must be denied to the extent that it argues that the existence of the ABMA precludes the promissory estoppel claims in this case.[11]

### ii. Sufficiency of the Allegations of "Promises" Made by Dunkin'

Dunkin' next argues that the amended complaints are deficient under *Iqbal* and *Twomby* because the promises which are sought to be enforced in this action are not sufficiently pled in

---

made by Dunkin'. (*See* Docket No. 16). Given the Court's ruling that the "promises and representations" are not sufficiently pled by Plaintiffs, as they do not differentiate to whom the promises were made, or provide any context of same, the Court is simply unable to determine if Thompson and Johnson were acting as agents for PBD or if Johnson was acting as an agent for F & J when they took these actions in furtherance of the alleged "promises and representations" or if their actions were taken in reasonable reliance of same.

[10] Black's Law Dictionary defines an "executory contract" as "[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction and sometimes memorialized by an informal letter agreement, by a memorandum, or by oral agreement." BLACK'S LAW DICTIONARY, "executory contract" (9th ed. 2009).

[11] The Court expressly declines to rule on whether the ABMA can be properly characterized as an executory contract or whether the same would make the agreement unenforceable and defeat Dunkin's contract-based arguments. It is enough to survive the motion to dismiss that PBD has alleged that Dunkin' made promises which were outside the scope of the ABMA, stating a plausible claim for relief. The Court would note, however, that the law is clear that a promissory estoppel claim may be precluded by an enforceable written agreement which covers the same subject matter as the alleged promise and a party is barred from recovering under both breach of contract and promissory estoppel theories. *See TES Franchising, LLC v. Dombach*, 2010 WL 5071472, at *11. But, PBD has not sued Dunkin' for breach of contract in this case. (Docket Nos. 16, 27).

accordance with the pleading standards set forth in those decisions. (Docket Nos. 26, 32, 33). Plaintiffs and Intervenor Plaintiffs counter that the promises made by Dunkin' are sufficiently pled. (Docket Nos. 28, 37).

In their Amended Complaint, the Plaintiffs allege that their claim is supported by "certain promises and representations" made by Dunkin pursuant to the Pittsburgh Supply Plan – which they describe as containing two main components: (1) the business purpose of providing all baked goods and donuts to Dunkin's franchisees in the Pittsburgh area; and (2) the social purpose of building a manufacturing facility in a low-income, minority populated area of the City and providing jobs to individuals residing in those areas. (Docket No. 16 at ¶¶ 22, 73-76, 79, 81-82). In their brief, Plaintiffs parrot the allegations set forth in their Amended Complaint to explain the "promises and representations" made to them. (Docket No. 28). These paragraphs generally present the factual circumstances of the business dealings of the parties in this case, including that numerous meetings were held amongst the parties wherein: Dunkin dictated specifications for the commissary; Dunkin directed Plaintiffs to undertake certain acts, like relocating the commissary from Homewood to Braddock, executing leases, etc.; and that Dunkin directed Johnson to purchase PBD from Gandy. (Docket No. 16 at ¶¶ 22, 73-76, 79, 81-82). Plaintiffs further maintain that said "promises or representations" induced them to enter into numerous agreements with third parties including, among other things, contracts for architectural services, renovations and lease agreements. (*Id.* at ¶¶ 81, 82).

In this Court's estimation, while the Plaintiffs' Amended Complaint contains several allegations which can be easily described as a series of commands or orders from Dunkin' to Plaintiffs Johnson, Thompson and F & J, it is unclear from this pleading what "promises and representations" were made to them if the commands or orders were carried out. (*See* Docket

No. 16).  To this end, Plaintiffs do not specifically allege the content of the alleged promises; identify with specificity to whom any alleged promise was made; or when such promises were made.  (*Id.*).  At most, it can be implied that Johnson, Thompson and F & J entered into these contracts with third parties based on the unspecified promises made by Dunkin' to do business with PBD.  But, the Court of Appeals has recognized that Pennsylvania law requires an "express promise" rather than these types of vague, implied promises which are not sufficient to sustain a promissory estoppel cause of action under Pennsylvania law.  *See C & K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (finding that an "express promise" was required and further holding that "[p]romissory estoppel would be rendered meaningless if this Court were to allow [a party] to maintain an action for detrimental reliance based on the alleged existence of [ … ] a broad and vague implied promise.").  Thus, under Third Circuit precedent, as well as the pleading standards as they have been refined in *Twombly* and *Iqbal*, the allegations that Dunkin made "promises and representations" to Plaintiffs generally – without specifying the nature of same, to whom they were made or when– constitute mere legal conclusions which fail to state a plausible claim upon which relief can be granted under a promissory estoppel theory.  *See Vigilante v. Statharos*, 08-CV-3408, 2009 WL 398781, at *2 (E.D. Pa. Feb. 16, 2009) (quoting *Fried v. Fisher*, 328 Pa. 497, 196 A. 39, 43 (Pa. 1938)) ("Courts must be careful to avoid applying the doctrine to vague representations or puffery, and thus must look to see if the alleged promise is explicit enough to induce action and if the proposed action be of 'definite and substantial character.'").

Stated more succinctly, while Plaintiffs allege that they made financial investments for the purpose of starting the donut commissaries, and that Dunkin' directed them to perform certain tasks related to the commissary project which necessarily required financial investment,

they have not alleged any facts which would indicate that Dunkin' made promises to them that their financial investments would be recouped. "[T]here can be no justifiable reliance without an express promise." *TES Franchising, LLC*, 2010 WL 5071472, at *11 (citations omitted). Accordingly, Plaintiffs' promissory estoppel claim must be dismissed, without prejudice.

On the other hand, the Amended Complaint filed by Gandy and PBD sets forth the alleged promise made by Dunkin' to them more explicitly and includes factual allegations which are absent from the Plaintiffs' Amended Complaint. (*See* Docket No. 27). According to these parties, they were promised by Dunkin' that its franchisees would be **required** to purchase donuts and other baked goods from PBD if the commissary was built according to Dunkin's specifications. (*Id.* at ¶¶ 11-12). In this Court's estimation, Intervenor Plaintiffs have sufficiently alleged an express promise upon which a claim for relief under a promissory estoppel theory may be granted. *See TES*, 2010 WL 5071472, at *11. Therefore, Dunkin's motion to dismiss the Intervenor Plaintiffs' promissory estoppel claim is denied.

### iii. Reasonableness of Reliance

Dunkin' next argues that the terms and conditions of the ABMA support dismissal of the promissory estoppel claims brought by Plaintiffs and Intervenor Plaintiffs. (Docket Nos. 26, 32, 33). Dunkin' reasons that in §§ 2E and 2F of the ABMA it expressly disclaimed that it was making any guarantees regarding a minimum amount of purchases of products under the agreement and granted no exclusive territory to PBD. (*Id.*). Dunkin' contends that the actions of the opposing parties in this case could not be reasonable because the ABMA provides, in pertinent part, that:

> E. Manufacturer [Pittsburgh Baker's Dozen] acknowledges that Manufacturer is granted no exclusive territory or service area under this Agreement.

> F. Manufacturer [Pittsburgh Baker's Dozen] acknowledges and agrees that Franchisor [Dunkin' Donuts Franchising LLC] has made no commitment on its own behalf or on behalf of its franchisees to purchase, distribute, or to cause to be purchased or distributed any minimum amount of Products [donuts] or that Manufacturer's revenue will increase by a specified amount or percentage. To the extent that Franchisor may have provided Manufacturer with historical or estimated Product volumes, Franchisor will not be liable if Manufacturer's actual sales are less than the amount stated in such data, forecasts or projections.

See ABMA at §§ 2E, 2F.

"Under Pennsylvania law, the promisor must have an objectively reasonable belief that a purported promise will induce action by the promisee." *Burton Imaging Group v. Toys ""R" Us, Inc.* 502 F.Supp.2d 434, 439 (E.D. Pa. 2007). Generally, whether a party acted reasonably in response to a promise is a fact issue reserved for the jury at trial. *See Dilworth v. Metro. Life Ins. Co.,* 418 F.3d 345, 354 (3d Cir. 2005) (quoting *Tran v. Metropolitan Life Insurance Company,* 408 F.3d 130, 139 (3d Cir. 2005)) ("the issue of whether reliance on a representation is reasonable (or justifiable) is generally a question of fact that should be presented to the jury."). Here, Dunkin' contends that the Court may make this determination as a matter of law in the context of its present motion to dismiss. In support of this position, Dunkin' relies on three decisions which were decided at the summary judgment stage, i.e., *Luther v. Kia Motors America, Inc.*, 676 F.Supp.2d 408 (W.D.Pa. 2009); *Josephs v. Pizza Hut of America, Inc.*, 733 F.Supp. 222 (W.D.Pa. 1989); *Burton Imaging Group*, 502 F.Supp.2d at 439 ("businesses may not rely merely on their own interpretation of the legal significance of a promise."). Starting with *Josephs*, these cases stand for the proposition that reasonable reliance cannot be established by mere proof that a sophisticated individual made a decision based on his own business judgment, rather than relied on an express promise by the promisor. *See id.*

In *Josephs*, the district court found that the reliance of the plaintiffs on a supposed promise by a Pizza Hut representative that approval of a lease was a mere formality was not reasonable when it was based on the plaintiffs' independent judgment and the legal opinion of their own counsel that Pizza Hut would approve a lease, while written correspondence from Pizza Hut clearly stated that the lease would not be approved. *See Josephs*, 733 F.Supp. at 226-27. A similar holding was reached in *Luther* at the summary judgment stage; however, Dunkin' fails to point out that a motion to dismiss was denied in that case as the court refused to consider the contract as outside the pleadings on a motion to dismiss and held that reasonableness was a fact issue which was ordinarily to be determined at trial. *See Luther v. Kia Motors America, Inc.,* 2008 WL 2397331, at *4 (W.D. Pa. Jun. 12, 2008). Only after the full record had been developed, and Kia had established its defense through proof obtained during discovery, was the issue of reasonableness decided by the Court at summary judgment. *See Luther*, 676 F.Supp.2d 408.

Turning to this matter, as is discussed above, Johnson, Thompson, F & J and Gandy are not parties to the ABMA. *See ABMA*. Further, the Court has already held that the claims brought by Johnson, Thompson and F & J must be dismissed for lack of specificity in pleading; while Gandy's claims are not so deficient. In any event, because they are not parties to the ABMA, this agreement cannot be considered integral to their promissory estoppel claims against Dunkin' as their claims do not rely on the contract. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 184 F.3d at 287. Dunkin' cannot establish its contract-based defense to the promissory estoppel claim without relying on the contract. Thus, with respect to these plaintiffs, the ABMA is a document outside of the pleadings and, as such, the substance of this agreement may not be considered by the court when deciding the viability of Dunkin's defense. *See id.*

Moreover, even if the ABMA was considered, the mere fact that these plaintiffs referenced the ABMA in their pleadings does not prove that their conduct was unreasonable as a matter of law. *See Burton,* 502 F.Supp.2d at 439. To this end, although the individual plaintiffs have pled in some fashion that they are sophisticated businesspeople, the fact that PBD agreed to certain disclaimers in its contract with Dunkin' does not undermine the plausibility of their individual claims – which do not rely on the contract. On a motion to dismiss, all factual inferences must be resolved in favor of the plaintiffs, not the defendant, as is suggested by Dunkin' here. *See Iqbal*, 129 S. Ct. at 1949-50. Therefore, to the extent that Dunkin' argues that the individual plaintiffs' actions were not objectively reasonable given the language of the agreement, Defendant's motion to dismiss is denied, without prejudice to be renewed at summary judgment.

Regarding PBD's claim, it alleges that Dunkin' promised that its franchisees were required to purchase donuts and baked goods from PBD if a commissary was built according to Dunkin's specifications and directions. (Docket No. 27 at ¶¶ 11-12). The ABMA provides that in exchange for approval as a supplier, PBD "acknowledges and agrees that Franchisor [Dunkin' Donuts Franchising LLC] has made no commitment on its own behalf or on behalf of its franchisees to purchase, distribute, or to cause to be purchased or distributed any minimum amount of Products [donuts] or that Manufacturer's revenue will increase by a specified amount or percentage. To the extent that Franchisor may have provided Manufacturer with historical or estimated Product volumes, Franchisor will not be liable if Manufacturer's actual sales are less than the amount stated in such data, forecasts or projections." *ABMA* at § 2F. Dunkin' maintains that by virtue of this provision, PBD expressly acknowledged that it was not guaranteed any amount of purchases of donuts or other baked goods by Dunkin' and/or its franchisees and

therefore cannot claim that Dunkin' promised otherwise. (Docket No. 32). However, the ABMA is completely silent with respect to PBD's (or any other individual or entity's) building of a commissary. *See generally ABMA*. To this end, there are no provisions in the agreement which describe the existence or non-existence of a facility within which PBD was to perform its manufacturing/baking services under the ABMA. *Id.*

Dunkin' further contends that the integration/no oral modification clause in the agreement bars PBD's claim that its reliance on supposed oral representations was reasonable. (Docket No. 32). However, the provision of the ABMA upon which Dunkin' relies expressly states that it is limited to the "subject matter" of the contract. *See ABMA* at § 25 ("This Agreement sets forth the entire understanding of the parties in connection with the subject matter hereof. No party has made or relied on any statement, representation or warranty in connection herewith except as expressly set forth herein. This Agreement may only be modified in writing and signed by both parties."). The subject matter of the ABMA, as set forth in the recitals, is to establish PBD as an approved supplier for Dunkin's products and to set forth the terms and conditions related to its role as an approved supplier.[12] *Id.* at 2. In addition, this clause disclaims any statements, representations or warranties made *prior* to execution of the agreement (which is limited by subject matter). *See Id.* at § 25. But, the ABMA was fully executed by representatives from both sides by early January, 2007. *See ABMA* at 14. After the agreement

---

[12] The Court disagrees with Dunkin's assertion that the written ABMA contract and the alleged oral promise under the Pittsburgh Supply Plan pertain to the "exact same subject matter." "Subject matter" is undefined in the ABMA. *See generally, ABMA*. In this Court's estimation, accepting the facts pled in the amended complaint, as true, and drawing all reasonable inferences in favor of PBD, the subject matter of the two statements allegedly made by Dunkin' are not necessarily contradictory or mutually exclusive, i.e.: (1) under the ABMA, Dunkin' promises that PBD is approved as a supplier but Dunkin' expressly does not guarantee any minimum level of purchases by Dunkin' or its franchisees; and (2) under the oral Pittsburgh Supply Plan, Dunkin' allegedly promises that if PBD builds a commissary – Dunkin' will require its franchisees to purchase products from PBD. At this stage of the proceedings, PBD has stated a plausible claim, i.e., that while no guarantees as to purchases were made by virtue of the approval of PBD as a supplier; the promise to purchase is conditioned on a later event, the building of the commissary.

was signed, PBD alleges that the parties had continuous business meetings starting in February of 2007 during which, among other things, the location of the commissary was discussed and progress reports were given as to the status of building same. PBD avers that Dunkin' was apprised of the engagement of third party contractors to work on the building of the commissary. (Docket No. 16 at ¶¶ 25-39). These discussions continued until Dunkin' informed PBD that the relationship was over. (*Id.* at ¶¶ 62-63). Thus, accepting PBD's allegations as true, as this Court must on a motion to dismiss, PBD has pled a plausible claim that Dunkin' made promises to it outside of the "subject matter" of the written ABMA contract, i.e., that if it built a commissary, Dunkin' would require its franchisees to purchase donuts and other baked goods from PBD – now an approved supplier of Dunkin' products – and allegedly continued to make representations regarding this promise *after* the ABMA was executed in January of 2007. (Docket Nos. 16 at ¶¶ 25-39; 27 at ¶¶ 11-12). This promise is distinct from the disclaimer in the contract that Dunkin' was not guaranteeing that any specific amount of donuts and/or baked goods would be purchased from PBD by Dunkin' or its franchisees. To the extent that Dunkin' can prove otherwise, it must do so with proof of facts outside the Amended Complaint and ABMA. Therefore, Dunkin's motion is denied, without prejudice, to renewing its arguments at summary judgment.

iv.  Gandy's Standing

Dunkin' also maintains that Gandy lacks standing to bring a promissory estoppel claim against it given that his injuries, if any, are not distinct from the injuries suffered by his corporation, PBD. (Docket No. 32). In response, Gandy counters that he sustained separate injuries as the proposed deal to purchase his PBD stock by F& J was thwarted by Dunkin's unilateral cancellation of the Pittsburgh Supply Plan and the ABMA. (Docket No. 37). Gandy

asserts that pursuant to their deal he stood to be paid $400,000 for his interest in PBD, $100,000 cash and also have $100,000 of debt to the URA satisfied by F & J. (Docket No. 27 at ¶ 15). While Gandy admits that PBD was a party to the Pittsburgh Supply Plan (and the ABMA), he argues that he invested his own money in the commissary project along with PBD. (*Id.* at ¶ 14).

With respect to the supposed merger with F & J, Gandy has not alleged that Dunkin' promised him anything. Instead, he pleads that "Defendant **suggested** that F & J Holdings, Inc. acquire all of the stock in PBD and F & J Holdings, Inc. and pay all of the debts of PBD."[13] (Docket No. 27 at ¶ 4). Thus, the supposed losses associated with the cancellation of Gandy's stock sale to F & J do not flow from his reliance on any promises made by Dunkin' and do not appear to be recoverable under a promissory estoppel action against Dunkin'. *See Vigilante v. Statharos*, 2009 WL 398781, at *3 (citing *Lobolito, Inc. v. N. Pocono Sch. Dist.*, 562 Pa. 380, 755 A.2d 1287, 1292 n. 10 (Pa.2000)) ("Pennsylvania courts have found that damages for promissory estoppel are limited to expenses and losses incurred in reliance on the actionable promise."). Indeed, the injuries to the value of Gandy's stock, if any, are not distinct from any injuries that his corporation suffered in this action. *See Sharp Electronics Corp. v. Uriel Yoggev et al.*, Civ. A. No. 94-5652, 1995 WL 263533, at *2 (E.D.Pa. May 1, 1995) (citations omitted) ("A stockholder has no standing in his individual capacity to file suit for damages that are derivative of harm inflicted on the corporation, even if he is the sole shareholder."). However, Gandy has sufficiently alleged that he sustained an individual injury in this case because he invested his own money in the commissary project as a result of the purported promise made by Dunkin' to him. *See Id.* (noting that an allegation of harm to an individual which is "separate and distinct" from the harm to the corporation may sustain a claim by that individual). Whether

---

[13] In their Amended Complaint, Johnson and F & J plead that Dunkin' directed them to make this purchase. (Docket No. 16 at ¶ 67).

it was reasonable for him to do so in light of the ABMA and the other circumstances of this case cannot be established by Dunkin' based on the amended complaint alone, the allegations of which the Court must take as true and all reasonable inferences must be resolved in Gandy's favor. *See Iqbal*, 129 S. Ct. at 1949-50. Therefore, because Gandy has alleged that he invested his own money in the commissary as a result of Dunkin's alleged promise, an injury separate and distinct from the injuries allegedly caused to the corporation, he has standing to pursue this action.

v. <u>Conclusion as to Promissory Estoppel Claims/Leave to Amend</u>

Based on the foregoing, the Court holds as follows. Dunkin's Motion to Dismiss the promissory estoppel claims brought by Plaintiffs Johnson, Thompson, and F & J is granted because Plaintiffs have failed to sufficiently allege any promise that was made to them by Dunkin' and, thus, have not stated a plausible claim for relief. Plaintiffs have not expressly sought leave to amend their complaint a second time. However, the Court will grant Plaintiffs leave to amend their claim as it is not clear to the Court that any such amendment would be futile given that the Intervening Plaintiffs were able to sufficiently aver an express promise based on the same facts and circumstances of this case and Plaintiffs' counsel stated at the motion hearing that his clients possessed additional information which was not pled in their Amended Complaint. *See Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)) ("Among the grounds that justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice and futility."). Dunkin's Motion to Dismiss the promissory estoppel claims brought by Intervenor Plaintiffs PBD and Gandy is granted, in part, and denied, in part. Said motion is granted to the extent that Gandy's claim for compensatory damages resulting from the proposed sale of PBD to F & J is

dismissed as such damages are not recoverable under a promissory estoppel theory. Dunkin's motion to dismiss Intervenor Plaintiffs' Amended Complaint is denied in all other respects.

### B. Race Discrimination Claims

The Court now turns to the plaintiffs' race discrimination claims. Section 1981, which prohibits racial discrimination in the making and enforcement of contracts, provides:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. "In order to state a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) [plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts." *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (internal quotations omitted). As to the third element, "[s]ection 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an

existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

i. Standing

Defendant first argues that the individual plaintiffs (Johnson, Thompson and Gandy) and F & J do not have standing to maintain a section 1981 action in light of the Supreme Court's decision in *Domino's Pizza*, wherein the Court examined whether a shareholder of a corporation had standing to maintain a 1981 action when he sought to enforce the contractual rights of the corporation, rather than his own. (Docket Nos. 26, 32, 33). In *Domino's Pizza*, the Supreme Court held that the shareholder did not have standing to bring his § 1981 case against Domino's even though the alleged racial discrimination was specifically directed at him because the contractual rights he claimed were impaired were those of the corporation and not his own. *Domino's Pizza,* 546 U.S. at 475. In so holding, the Court noted that:

> The right to "make contracts" guaranteed by the statute was not the insignificant right to act as an agent for someone else's contracting—any more than it was the insignificant right to act as amanuensis in writing out the agreement, and thus to "make" the contract in that sense. Rather, it was the right—denied in some States to blacks, as it was denied at common law to children—to give and receive *contractual rights* on one's own behalf .

*Id.* at 475 (emphasis in original). Thus, "[a]ny claim brought under § 1981, [ … ] must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Id.*; *see also Whaumbush v. City of Philadelphia*, 747 F.Supp.2d 505, 518-19 (E.D.Pa. 2010) (same). Section 1981 covers both existing and prospective contractual relationships, *see Domino's Pizza*, 546 U.S. at 476, and the contractual rights of an individual or entity which are protected by § 1981 are established under state law and may include intended third party

beneficiaries to contracts, *see Whaumbush*, 747 F.Supp.2d at 520 and *Shumate v. Twin Tier Hospitality*, 655 F.Supp.2d 521, 534-35 (M.D.Pa. 2009).[14] *See also North American Roofing & Sheet Metal Co., et al. v. Building & Construction Trades Council of Philadelphia & Vicinity, AFL-CIO, et al.*, Civ. A. No. 99-2050, 2000 WL 230214, at *3 (E.D.Pa. Feb. 29, 2000) (same).

As is discussed in the preceding section, there are two contractual relationships at issue in this case which could potentially support a race discrimination claim under § 1981, i.e., the written ABMA and the oral Pittsburgh Supply Plan. Based on the Court's prior analysis, only PBD is a party to the ABMA and has any rights under that agreement because PBD and Dunkin' expressly stipulated that no third party beneficiaries were created under the contract. *See ABMA* at § 24. Therefore, PBD is the sole party in this case which has standing to assert a § 1981 claim relying on the ABMA and to the extent that the claims brought by Gandy, Johnson and Thompson relying on the ABMA, their claims must be dismissed. With respect to the standing of the individual plaintiffs under the Pittsburgh Supply Plan, and the standing of F & J, further discussion is necessary.

The Court first analyzes the standing of the individual plaintiffs, Johnson, Thompson and Gandy, to assert a § 1981 race discrimination claim based on the Pittsburgh Supply Plan. In this Court's estimation, these individuals do not have standing to bring a § 1981 claim against Dunkin' because they have not alleged that they: (1) were parties to the Pittsburgh Supply Plan; or, (2) were third party beneficiaries to the Pittsburgh Supply Plan.

---

[14]      In *Domino's Pizza*, the Supreme Court noted that third party beneficiaries of a contract may be able to sue under section 1981, but expressly declined to resolve the issue as McDonald had not argued that he was a third party beneficiary to the contract at issue in that case. *See Domino's*, 546 U.S. at n.3. The United States Court of Appeals for the Third Circuit has not addressed this issue, but district courts within the Third Circuit have recognized that an intended third party beneficiary of a contract may maintain a § 1981 claim. *See Whaumbush*, 747 F.Supp.2d at 520; *see also Shumate*, 655 F.Supp.2d at 534-35.

Based on the allegations in the Amended Complaints, it is clear that the parties to the Pittsburgh Supply Plan included PBD, Dunkin' and other third parties not directly involved in this case. (*See* Docket Nos. 16, 27). To this end, none of the individual plaintiffs have pled that they were parties to the Pittsburgh Supply Plan. Instead, they have pled that they were acting as agents of PBD during the events described in this case. (Docket Nos. 16 at ¶¶ 9, 11, 19-21). Specifically, Johnson and Thompson pled that they are independent contractors or consultants who worked on behalf of PBD and Gandy pled that he is the sole shareholder and owner of PBD.[15] (*Id.*). Under *Domino's Pizza*, corporate agents and shareholders who assert that the contractual rights of the corporation were interfered with because of racial animus do not have standing to pursue § 1981 claims. *See Domino's Pizza*, 546 U.S. at 478. The same is true for Johnson who was allegedly the actual target of racial animus by the unnamed Heartland representative who made "unwelcome comments" during the inspection of the prospective Homewood commissary site. *See Id.* (individual who was the "actual target" of discrimination but had no rights under the contractual agreement, lacked standing to pursue a § 1981 claim).

The individual plaintiffs also have not argued that they have rights under the Pittsburgh Supply Plan based on a third party beneficiary theory. (*See* Docket Nos. 16, 27, 28, 36, 37). However, even if they had attempted to advocate this theory, the factual averments in their amended complaints are not sufficient to establish that they were third party beneficiaries to the Pittsburgh Supply Plan. Like Massachusetts, Pennsylvania has adopted Restatement (Second) of

---

[15]    In his briefs, Gandy argues that he was a party to the Pittsburgh Supply Plan, establishing his standing under § 1981. (*See* Docket No. 37 at 15-16). However, that fact is not pled in the Intervenor Plaintiffs' Amended Complaint, (*see* Docket No. 27), and, as such, is not taken as true by the Court when deciding the instant motion to dismiss his claims. To the contrary, Gandy alleges that: he was the sole shareholder of PBD; and that "PBD remains the party to the Pittsburgh Supply Plan as alleged between the Defendant and PBD." (Docket No. 27 at ¶¶ 2, 5). At most, Gandy has alleged that he, along with PBD, Dunkin' and several third parties, "began establishing" the Pittsburgh Supply Plan. (*Id.* at ¶ 10).

Contracts § 302.  *See Scarpitti v. Weborg*, 530 Pa. 366, 609 A.3d 147, 150 (1992).  Under Pennsylvania law,

> a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti*, 609 A.2d at 149-50 (internal citations omitted); *see also Tredennick v. Bone*, 647 F.Supp.2d at 498 (quoting same).

Here, the Pittsburgh Supply Plan is, at most, an oral agreement based on this Court's understanding of the parties' averments in their pleadings.  Stated generally, the Pittsburgh Supply Plan was an agreement between Dunkin', as franchisor, the approved manufacturers, Lok and PBD, and other third party entities.  (Docket Nos. 16 at ¶¶ 13, 15, 17; 27 at ¶ 10).  The purpose of the Pittsburgh Supply Plan included, among other things, Dunkin's plan to build two commissaries in the Pittsburgh area – one in the east (PBD) and a second in the west (Lok).  (Docket No. 16 at ¶¶ 13-18).  Plaintiffs aver that their understanding of the Pittsburgh Supply Plan was that Dunkin's local franchisees would be contractually required to purchase Dunkin' products for sale in their stores from the two commissaries – which would be the exclusive suppliers of such goods in the area.  (*Id.* at ¶¶ 23-24).  They also allege that there was an underlying social purpose of the Pittsburgh Supply Plan to bring jobs and prosperity to Homewood, an area of the City with a large minority population and also a high number of individuals who were unemployed or held low income jobs.  (*Id.* at ¶ 16).

In this Court's estimation, the terms of Pittsburgh Supply Plan, as pled by the individual plaintiffs, do not establish that any of them were intended beneficiaries of the deal.  (*See* Docket

Nos. 16, 27). For their part, Thompson and Johnson have not sufficiently alleged that Dunkin' made any promises to them and the Court has dismissed their promissory estoppel claims. Based on the terms of their alleged relationship which are pled and the lack of any promises made to them by Dunkin', neither Johnson nor Thompson have pled that the parties to the Pittsburgh Supply Plan intended that they, as individuals, should personally benefit from PBD's involvement. For similar reasons, Gandy, as principal for PBD, does not have standing to enforce PBD's alleged contract with Dunkin' under § 1981. While Gandy's promissory estoppel claim has survived the motion to dismiss, based on Dunkin's promise to PBD that it would require its franchisees to purchase donuts and other products from PBD and Gandy's personal investment in the commissary project, he has not alleged that the parties intended that he was a beneficiary of the deal. (Docket No. 27). Instead, he repeatedly avers that Dunkin' made promises to his company, PBD, rather than to him personally. (*See Id.* at ¶¶ 2, 5). Beyond the promise to purchase products from PBD, it appears that the only other intended beneficiaries to this agreement were the people who lived in the area, who possibly would be employed there or benefit from the adoption of a new business in the area. For these reasons, the individual plaintiffs do not have standing to bring a § 1981 action in this case.

The Court next turns to F & J's standing. F & J argues that it is a "prospective contractor" in this case in that it sought to acquire PBD and step into its shoes under both the Pittsburgh Supply Plan and the ABMA. F & J further alleges that this acquisition was never consummated due, allegedly, to Dunkin's unlawful termination of both the Pittsburgh Supply Plan and the ABMA. In this Court's estimation, F & J cannot be appropriately characterized as a "prospective contractor" sufficient to establish standing in a § 1981 claim against Dunkin'. While a "prospective contractor" has standing to maintain a cause of action under § 1981, F & J

never acquired any of its *own rights* under a contract or prospective contract with Dunkin'. *See Domino's Pizza,* 546 U.S. at 475 (holding that § 1981 only protects a party's interest in its own contractual rights). Instead, F & J had a prospective contract with PBD which was never fully executed. (*Id.* at ¶ 69). Thus, like the individual plaintiffs, F & J is merely attempting to enforce an alleged discriminatory interference of PBD's rights under the Pittsburgh Supply Plan and/or ABMA. And, as Dunkin' aptly points out, based on the pleadings, F & J was not even created as a legal entity until July 2007 at a time *after* the alleged discriminatory comments were made at the Homewood site by a Heartland representative in May of the same year. (*Id.* at ¶¶ 45, 47-48, 68). Therefore, F & J does not have standing to pursue a section 1981 claim against Dunkin'.

For these reasons, Dunkin's motions to dismiss the § 1981 claims brought by Johnson, Thompson, Gandy and F & J based on their lack of standing under *Domino's Pizza* are granted. Said claims must be dismissed, with prejudice.

ii.    Discriminatory Conduct

Given these rulings, only PBD has standing to bring a § 1981 claim in this case. Dunkin' argues that PBD has not sufficiently pled that Dunkin' engaged in any discriminatory conduct and further maintains that it cannot be liable for the alleged discriminatory conduct by its franchisee, Heartland. (Docket No. 32). PBD believes that it has sufficiently pled that it was a victim of discrimination. (Docket Nos. 36, 37).

Under *Iqbal* and *Twombly*, a plaintiff must plead sufficient factual matter to support the averments in the complaint and the court is directed to disregard legal conclusions. *See Burch*, 662 F.3d at 221. The second element of a race discrimination claim under § 1981 requires a plaintiff to plead sufficient facts to create an inference of race discrimination by the defendant. *See Brown*, 250 F.3d at 797; *see also Gross v. Reynolds*, CIV.A. 10-2380, 2011 WL 4402106, at

*4 (M.D. Pa. Sept. 22, 2011) ("In order to state a violation of § 1981, 'a specific factual basis must be pled to create the inference of discrimination.'").  Thus, in accord with Supreme Court precedent, PBD must provide factual support for the legal proposition that it suffered discrimination.  *See Id.*  It cannot simply intone the legal conclusion that it was subject to discrimination.  *Id.*  Given this standard, PBD has failed to plead sufficient facts from which a reasonable inference of race discrimination against Dunkin' can be drawn in its Amended Complaint.

In their entirety, the allegations of race discrimination initially made by Plaintiffs (and incorporated by PBD) include that:

> 43. In May 2007, Heartland personally inspected the "PBD Commissary," located at 6947 Kelly Street, Homewood PA 15208.
>
> 44. Heartland made **unwelcome comments about the commissary because of the race of Johnson, his associates, and the race of the neighborhood.**
>
> 45. Shortly thereafter, in May of 2007, Green called Thompson and told him "there is a problem, Heartland does not like the building. How can we solve it?"
>
> 46. There was nothing about the building that was inconsistent with prior communications or directions from the Defendant.
>
> 47. It is believed and therefore averred that **Defendant tacitly approved of [ … ] Heartland's race discrimination.**
>
> 48. Defendant told Thompson that **Heartland had an issue with Homewood because of the race of the populous [sic]. That it could not sell donuts made in Homewood because the area is predominantly black.**
>
> …
>
> 87. After inspection of the areas and the populous [sic], defendant and partner companies, unilaterally breached promises **due to Plaintiff's race, the race of his associates and the race of the neighborhood and anticipated work force.**

88. **Race was a factor** in interfering with prospective business relationships, verbal promises and agreements.

89. There was no legitimate business reason to switch from fresh donuts to frozen donuts and to end the business relationship with the Plaintiffs.

90. Defendant **discriminated** against Plaintiffs and there [sic] associates and anticipated employees **because of race or tacitly approved of the racial animus of other business partners** in terminating the business relationship and breaching binding promises to Plaintiff.

(Docket No. 16 at ¶¶ 43-48, 87-90 (emphases added)).   The Intevenor Plaintiffs then further allege that:

16. To the best of their information, Gandy and PBD understand and aver that Defendant terminated its participation in the Pittsburgh Supply Plan and affirmatively allowed HCC and its other Franchisees to purchase donuts and other baked goods from sources other than PBD and Plaintiffs **because HCC objected to being required to purchase such goods manufactured by members of the African American community, including Gandy.**

(Docket No. 27 at ¶ 16 (emphasis added)).

Reviewing the allegations enumerated above, the Court finds that the Intervenor Plaintiffs' Amended Complaint does not contain sufficient factual matter to set forth a plausible race discrimination claim under § 1981.   Admittedly, PBD avers that Heartland made "unwelcome comments" about its agent, Johnson, and the neighborhood and "had an issue" with the neighborhood, "because of the race" of the populace.   These allegations, however, are legal conclusions which must not be accepted as true by the Court on a motion to dismiss.  *See Iqbal*, 129 S.Ct. at 1950 ("because they are no more than conclusions, [these allegations] are not entitled to the assumption of truth.").   Without factual allegations suggesting purposeful discriminatory intent linking the "unwelcome comments" or "issue" to the race of Johnson, Thompson, Gandy or the individuals residing in Homewood, those terms do not evoke racial

discrimination on the part of Dunkin'. The United States Court of Appeals for the Third Circuit has recognized that such ambiguous phrases, taken in isolation, are not sufficient to support a claim of purposeful race discrimination by a defendant. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) ("several courts have determined that the phrase 'you people' is too ambiguous to constitute direct evidence of discrimination when used in isolation, as it was here."); *see also Flagg v. Control Data*, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992), *aff'd*, 998 F.2d 1002 (3d Cir. 1993) ("Conclusory allegations of generalized racial bias do not establish discriminatory intent.").

Dunkin' also contends that PBD has not sufficiently pled that Dunkin' directly engaged in purposeful race discrimination but merely "tacitly approved" the race discrimination allegedly committed by Heartland by terminating the Pittsburgh Supply Plan and the ABMA. (Docket Nos. 26, 32, 33). To this end, PBD alleges that Dunkin' told Thompson that Heartland objected to the location because it could not sell donuts manufactured in Homewood by African Americans. (Docket No. 27 at ¶ 16). PBD argues that it is reasonable to infer from these allegations that Dunkin' engaged in racial discrimination because it did not enforce the supposed requirement in its franchise agreement that Heartland purchase donuts from PBD and thereby adopted Heartland's discriminatory motive for termination. (Docket No. 37). Having considered the allegations in the Amended Complaint, the Court agrees with Dunkin' that PBD has failed to adequately plead that Dunkin' engaged in purposeful discrimination. In this Court's estimation, the averment that Heartland "objected" to doing business with PBD in Homewood because of the predominant race of its inhabitants constitutes a legal conclusion as the only factual predicate supporting the alleged "objection" include the vague "unwelcome comments" to Johnson and the unspecified "issue" that Heartland had with the area. Mere conclusory

allegations of racial bias are insufficient to state a claim of race discrimination under § 1981. *See Flagg*, 806 F.Supp. at 1223; *see also Gross*, 2011 WL 4402106, at *4. Thus, PBD has not alleged sufficient factual matter upon which a claim of race discrimination against Dunkin' may be sustained.

Dunkin' alternatively argues that PBD's Amended Complaint fails to state a claim for relief because it is not liable for the alleged discriminatory conduct of its franchisee. (Docket No. 32). The Court agrees that PBD has failed to sufficiently plead that an agency relationship existed between franchisor Dunkin' and franchisee Heartland which would permit PBD to hold Dunkin' vicariously liable for Heartland's actions. Courts have recognized that "under Federal Rule of Civil Procedure 8, a plaintiff must plead facts sufficient to establish that the asserted agency relationship existed" and that "a plaintiff may not simply assert in conclusory terms that a party is another party's agent for purposes of vicarious liability." *Millar v. Pitman Bd. of Educ.*, CIV. 10-4104 RBK/JS, 2011 WL 2417141, at *5 (D.N.J. Jun. 13, 2011) (citations omitted); *Cf Black v. JP Morgan Chase & Co.*, CIV.A. 10-848, 2011 WL 4102802 (W.D. Pa. Aug. 10, 2011) ("[c]onclusory allegations of agency" are not sufficient to state a claim of vicarious liability of a parent corporation for the actions of a subsidiary). Under Pennsylvania law,

> the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship. Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties.

*Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 786 (3d Cir. 1978). In order to sufficiently plead a claim that a franchisee is an agent of a franchisor, a plaintiff must plead more

than a conclusory statement of the franchisee-franchisor relationship but enough facts from which a plausible claim of an agency relationship can be inferred.

Here, PBD has pled that Dunkin' and Heartland were the parties to a franchise agreement. (Docket Nos. 16 at ¶¶ 14, 15, 47, 48; 27 at ¶ 9). It is further alleged that Dunkin' – as franchisor – controlled the terms of its franchise agreements, including that it could require Heartland to purchase its products from only approved manufacturers. (Docket No. 27 at ¶ 9). In this Court's estimation, these facts are not atypical of a franchise relationship and are not sufficient to demonstrate that Heartland acted as Dunkin's agent during its dealings with PBD. *See Drexel*, 582 F.2d at 786. Accordingly, PBD has failed to sufficiently allege an agency relationship between Dunkin' and Heartland and to the extent that PBD alleges that Dunkin' is liable under an agency theory or vicariously liable for Heartland's actions, such claim is dismissed, without prejudice.

### iii. Conclusion as to § 1981 Claims/Leave to Amend

As to Dunkin's motion to dismiss the parties' § 1981 claims, the Court rules as follows. Dunkin's Motion to Dismiss Plaintiffs Johnson, Thompson and F & J's § 1981 claim is granted and this claim is dismissed, with prejudice. In civil rights cases, leave to amend generally should be granted *sua sponte*, even if the plaintiff does not affirmatively seek leave to amend. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251-52 (3d Cir. 2007). Here, Dunkin' challenged Plaintiffs' standing in its initial motion to dismiss to which Plaintiffs responded by filing an amended complaint. Despite exercising their right to amend, Plaintiffs have failed to correct the deficiencies in their Amended Complaint which were initially pointed out by Dunkin'. Plaintiffs have not affirmatively sought leave to amend this claim a second time. In this Court's estimation, leave to amend the § 1981 claim would be futile because

Plaintiffs have not established that they have any contractual rights vis-à-vis Dunkin' and thereby lack standing to sue Dunkin' under §1981. *See Shane*, 213 F.3d at 115 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434) ("Among the grounds that justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice and futility."). For the same reasons, the Court will grant Dunkin's Motion to Dismiss Gandy's § 1981 claim, with prejudice.

Finally, Dunkin's Motion to Dismiss PBD's § 1981 claim is granted, but said claim is dismissed, without prejudice. PBD is granted leave to amend its § 1981 claim because it has standing to bring such action but failed to sufficiently plead that Dunkin' engaged in any discriminatory conduct in this case, despite statements from counsel at the motion hearing that the plaintiffs possessed additional facts which may support this claim. Thus, amendment by PBD of its § 1981 claim is not futile and leave to amend will be granted.

VI.    CONCLUSION

Based on the foregoing, Dunkin's Motion to Dismiss Plaintiffs' Amended Complaint [25] is GRANTED and Dunkin's Motion to Dismiss Intervenor Plaintiffs' Amended Complaint [31] is GRANTED, IN PART, and DENIED, IN PART. Specifically, the Court holds that:

- Dunkin's Motion to Dismiss Plaintiffs Johnson, Thompson and F &J's promissory estoppel claims is GRANTED. Said claims are dismissed, without prejudice, to filing a second amended complaint against Dunkin'.

- Dunkin's Motion to Dismiss Plaintiffs Johnson, Thompson and F & J's § 1981 claims is GRANTED. Said claims are dismissed, with prejudice.

- Dunkin's Motion to Dismiss Intervenor Plaintiffs PBD and Gandy's promissory estoppel claim is DENIED.

- Dunkin's Motion to Dismiss Gandy's § 1981 claim is GRANTED. Said claim is dismissed, with prejudice.

- Dunkin's Motion to Dismiss PBD's § 1981 claim is GRANTED. Said claim is dismissed, without prejudice, to filing a second amended complaint against Dunkin'.

An appropriate Order follows.


_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Date: May 18, 2012

cc/ecf: All counsel of record