**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DERRICK J. JOHNSON, F & J HOLDINGS, )
INC., and CHARLES THOMPSON, )
           )
     Plaintiffs, )
           )
PITTSBURGH BAKER'S DOZEN, INC. and )
EDWARD GANDY, )
           )
     Intervenor Plaintiffs, )
           )
   v. )   Civil Action No. 11-1117
           )   Judge Nora Barry Fischer
DUNKIN' DONUTS FRANCHISING L.L.C., )
aka DUNKIN' BRANDS, INC., aka )
DUNKIN' DONUTS, )
           )
     Defendant.

## <u>MEMORANDUM OPINION</u>

### I. INTRODUCTION

This action involves promissory estoppel claims arising from Plaintiffs Derrick J. Johnson, his entity, F & J Holdings, Inc. ("F&J"), and Charles Thompson's, (collectively, "Plaintiffs") and Intervenor Plaintiff Pittsburgh Baker's Dozen, Inc.'s ("PBD") failed investments in renovating two buildings for the purpose of starting a donut commissary in the Pittsburgh area. (Docket Nos. 43, 48). Plaintiffs and PBD allege that they made the investments in the donut commissary in order to support a contractual relationship between PBD and Defendant Dunkin' Donuts ("Dunkin'"), making PBD an approved supplier to produce fresh donuts for Dunkin's local Pittsburgh franchisees. (*Id.*). Plaintiffs and PBD contend that the contractual relationship was part of a broader Pittsburgh Supply Plan ("PSP") under which City of Pittsburgh officials and members of the Urban Redevelopment Authority ("URA") worked with Dunkin' to locate the donut commissary in Pittsburgh. (*Id.*). They argue that Dunkin'

unilaterally terminated the PSP as a result of the introduction of Iditarod, a new frozen donut technology, and thereby breached certain promises to Plaintiffs and PBD. (*Id.*).

Presently before the Court are Dunkin's Motions for Summary Judgment in regards to the Second Amended Complaint filed by Plaintiffs and the Third Amended Complaint filed by PBD; Plaintiffs' Partial Motion for Summary Judgment; and, a Rule 12 Motion to Strike filed by Dunkin'. (Docket Nos. 99, 102, 105 and 132). The motions have been fully briefed.[1] (*See* Docket Nos. 100, 101, 103, 104, 106, 134). For the following reasons, Dunkin's Motion to Strike [132] and Motions for Summary Judgment [99], [102] are granted, and Plaintiff's Partial Motion for Summary Judgment [105] is denied.

## II. FACTUAL BACKGROUND

### A. The Parties

Dunkin' is a national franchisor of retail stores that sell coffee, donuts, and other bakery items. (Docket Nos. 101 at ¶ 1; 104 at ¶ 1). Around 2006, Dunkin' sought to increase the number of retail stores in the greater Pittsburgh area. (Docket Nos. 109 at ¶ 3; 115 at ¶ 2). Hence, the PSP was pursued by Dunkin' in order to supply the additional stores with fresh donuts and other bakery products for resale to customers. (*Id.*). Several Dunkin' representatives and consultants played a role during the development of the PSP, including: Scott Murphy, Vice President of Strategic Manufacturing and Supply; Jim Green, Consultant for Dunkin'; Chris Powers, Manager of Manufacturing; Paul McFarlane, Manager of Manufacturing; Allen Leonard, Construction and Engineering Manager; Troy Volk, Manufacturing; Anthony Braun, Operations Manager; Fred Rheaume, Manufacturing Development Manager; and, Joe Koudelka, Director of Manufacturing. (Docket Nos. 104 at ¶¶ 10, 45-46; 109 at ¶¶ 1, 9, 19, 23-25).

---

[1] With consent of the parties, oral argument on the pending Motions was cancelled on April 1, 2014. (*See Text Order 4/1/14*).

PBD is a Pennsylvania corporation that started business in January 2005 and operated a bakery at 6947 Kelly Street, Pittsburgh, PA. (Docket Nos. 101 at ¶¶ 2-3; 104 at ¶¶ 2-3; Def. Ex. B (Thompson Dep. 7:18-8:4)). PBD sold bakery products to approximately thirty (30) to forty (40) accounts, including restaurants and state institutions and PBD serviced these accounts for approximately three to four years. (Docket Nos. 101 at ¶ 3; 104 at ¶ 3; Def. Ex. B (Thompson Dep. 8:5-8)). Edward Gandy is, and always has been, the president, owner, and sole shareholder of PBD. (Docket Nos. 101 ¶ 4; 104 at ¶¶ 3, 8; Ex. D (Gandy Dep. 8:5-16)). PBD admits that Charles Thompson "acted in the capacity of Consultant to PBD, and in that capacity, directed and promoted the business of PBD" and Gandy, the president and owner of PBD, "deferred to Thompson believing that [he] had superior business acumen." (Docket No. 104 at ¶ 8). Gandy testified that "[PBD] was my business, but I entrusted it to Charles Thompson. He was the one that did everything. I really didn't stay on top of it because I trusted him." (*Id*. at ¶ 9; Def. Ex. D (Gandy Dep. 8:10-16)).

Thompson served as a consultant/independent contractor for PBD, F&J, and a company called Lok Bakery.[2] (Docket Nos. 101 at ¶ 14; 123 at ¶ 14). Thompson's role as a consultant/agent for PBD consisted of: securing contracts; managing the business; and training employees. (*Id*. at ¶ 15; Ex. B. (Thompson Dep. 18:20-19:5); 123 at ¶ 19 (Thompson Dep. at 229-223)). Thompson also signed documents identifying himself as a Vice President of PBD. (Docket No. 109 at ¶ 11, Ex. DBI 130). Thompson did not have a consulting agreement with PBD and apparently did not receive a salary. (Docket Nos. 101 at ¶¶ 14-16; 104 at ¶ 7; Def. Ex. A (Thompson Dep. 105:22-106:2); Def. Ex. B (Thompson Dep. 7:5-8, 18:20-19:5)). Instead, Thompson and Gandy had an informal arrangement whereby Thompson made renovations to a

---

[2] Lok Bakery is an entity owned by Farhad Salari Lak. (Docket No. 101 at ¶ 30). Lok Bakery was also involved in the PSP and was targeted to build the West Commissary. (*Id*.). Neither Lak nor Lok Bakery is a party to this litigation.

home owned by Gandy and would have been provided with the home for his residence if the deal with Dunkin' succeeded. (Gandy Dep. 15:5-12, 35:22-36:6). Despite the lack of an agreement, Thompson seeks recovery of $600,000.00 in consulting fees he allegedly lost as a result of Dunkin's termination of the PSP. Thompson was never a shareholder, officer or employee of PBD, F&J or Lok Bakery. (*Id*. at ¶ 17; Ex. A (Thompson Dep. 105:12-15); Ex. B (Thompson Dep. 19:11-20)). Thus, Thompson did not share in the profits or losses of PBD, F&J or Lok Bakery and was not legally responsible for the debts of PBD. (*Id*. at ¶ 18; Ex. B (Thompson Dep. 19:21-23)).

Johnson testified that he served as an independent contractor for PBD, delivering products for PBD. (Docket Nos. 101 at ¶¶ 5, 6; 104 at ¶ 4; Ex. F (Johnson Dep. 29:15-30:4, 24:21-25:8)). Johnson was neither an employee nor an owner of PBD and had no written agreement setting forth how he was to be paid by PBD for his services. (*Id*. at ¶¶ 8-9; Ex. F (Johnson Dep. 27:4-19, 29:23-30:1.)). Johnson also was not responsible for the debts of PBD. (*Id*. at ¶ 10; Ex. F (Johnson Dep. 30:5-8)).

Plaintiffs admit that the majority of PBD's debts, since its inception and through the course of the PSP, were not their responsibility. (Docket No. 127 at ¶¶ 9-10). However, Plaintiffs contend that Johnson began to pay PBD's bills in June 2007, citing a water bill paid on PBD's behalf. (*Id*. at ¶ 10). Thompson also arranged for financial support from Farhad Salari Lak to pay the debts of PBD. (Docket Nos. 127 at ¶¶ 10, 19; 101 at ¶ 55; Ex. A (Thompson Dep. 229: 21-233:13, 435:23-436:9)).

F&J Holdings, Inc. is a Pennsylvania corporation. (Docket Nos. 101 ¶ 12; 104 at ¶ 5). Johnson and non-party Farhad Salari Lak were the two shareholders of F&J. (*Id*. at ¶ 13; *Id*. at ¶ 6; Ex. F (Johnson Dep. 44:13-45:21)). F&J was formed by Johnson and Lak in July 2007 to

replace PBD in the PSP. (*Id*. at ¶ 53; *Id*. at ¶ 42). Plaintiffs admit that Thompson acted as the lead negotiator and was "in charge" of the PSP for both F&J and Lok Bakery. (Docket Nos. 101 at ¶ 24; 123 at ¶ 24).

Although it is not named as a party in this action, Heartland Restaurant Group, LLC, f/k/a Heartland Coffee Company ("Heartland"), was also involved and is described as Dunkin's largest franchisee in the Pittsburgh area. (Docket No. 16 at ¶ 15). Ed Jaten was the primary Heartland representative involved in communications with Dunkin' and PBD. (Docket No. 109 at ¶ 11).

*B. The Pittsburgh Supply Plan*

As noted, in the summer of 2006, Dunkin' was working toward expanding the number of its franchisees in the Pittsburgh market with a target goal of adding 100 retail stores. (Docket Nos. 104 at ¶¶ 11, 13; 123 at ¶¶ 11, 13; 109 at ¶ 3; 119 at ¶ 3). In order to accomplish this expansion, Dunkin' needed a baking solution to produce enough of its donuts and other baked goods to support the expected sales at these additional retail stores. (Docket No. 109 at ¶ 3). At the time, the primary strategy utilized by Dunkin' was to establish approved bakery manufacturers within the geographical area of a large number of its franchisees for the purpose of manufacturing and delivering fresh donuts and other baked goods to the franchisees on a daily basis. (*Id*.).

Around August 18, 2006, Dunkin' consultant Jim Green contacted PBD and Thompson regarding the creation of a bakery/commissary to supply prospective Dunkin' franchisees with fresh donuts and other baked goods. (Docket No. 109 at ¶ 1). Green approached Thompson about potentially using the baking facility on Kelly Street owned by Gandy where PBD operated

as an approved bakery manufacturer commissary and inquired if Thompson and Gandy would be interested. (Docket Nos. 109 at ¶ 1; 114 at ¶ 3).

This was the start of the discussions and efforts among the parties to develop what has to come to be known as the PSP. (Docket No. 109 at ¶ 3). The parties dispute the exact purpose of the PSP. Dunkin' claims that the purpose of the PSP was to supply a large Dunkin' franchisee expected to enter the Pittsburgh market, Heartland. (Docket Nos. 101 at ¶ 22; 104 at ¶ 11; Ex. A (Thompson Dep. 354:8-24); Ex. LL.). Plaintiffs and PBD contend that the PSP was initiated so that Dunkin' could induce prospective franchisees to enter into Store Development Agreements ("SDA's") with Dunkin' in order to expand the number of franchisees in greater Pittsburgh. (Docket No. 115 at ¶ 11). It is uncontested that the PSP envisioned the establishment of two commissaries, one located in the west of Pittsburgh and one located in the east of Pittsburgh. (Docket Nos. 101 at ¶ 23; 123 at ¶ 23; 104 at ¶ 13; 115 at ¶ 13). Eventually, it was determined that the east commissary was to be opened by PBD, and the west commissary was to be operated by Lok Bakery. (*Id.*).

During this time frame, Dunkin' was advised by its consultant Green that local, state and federal entities were supporting the development and construction of the commissary through low to no interest loans, low cost commercial property and favorable tax treatment. (Docket Nos. 109 at ¶ 7; 119 at ¶ 7; 117 at DBI 00017). Thompson hoped to receive support from the City and the Urban Redevelopment Authority for funding the project. (*Id.* at ¶ 4; 117 at DBI 00017).

*C. Initial Negotiations*

On August 30, 2006, Thompson provided Green with a Letter of Intent which set forth PBD's proffered terms and conditions for its pursuit of the opportunity to become an approved

baking manufacturer for Dunkin'. (Docket Nos. 109 at ¶ 2; 114 at ¶ 4). The Letter of Intent states:

> Letter of Intent—PBD's intent is to enter into a relationship with Dunkin' Brands whereby PBD will:
>
> 1) Manufacture and deliver products to Dunkin' Donuts retail stores, as required and specified, in the Pittsburgh, PA market.
>
> 2) Utilize and equip existing space adjacent to PBD 6947 Kelly Road Facility to address Dunkin' Brands short and long needs for the Pittsburgh, PA market.
>
> 3) Utilize Urban Development funds to support effort.
>
> 4) Achieve Dunkin' Brands short and long term unfinished donut target pricing aligned with volume milestones:
>
>    a) Up to 10,000 doz./wk.     2.20
>    b) Up to 20,000 doz./wk.     2.10
>    c) Up to 40,000 doz./wk.     2.00
>    d) >40,000 doz./wk.     1.90
>
> 5) Achieve finished donut and other bakery item pricing targets, being compensated with a margin equal to or greater than that of unfinished donuts.
>
> 6) Adjust pricing to reflect changes in ingredient and distribution costs on an ongoing basis and utility cost as required.
>
> 7) With prior approval of Dunkin' Brands, utilize capabilities to pursue other non-competitive donut opportunities in the Pittsburgh, PA market.
>
> 8) Make best efforts to execute a supply agreement by September 31, 2006.

(Docket No. 117 at DBI 3).

Dunkin' never executed the Letter of Intent, through its consultant Jim Green or otherwise. (Docket No. 119 at ¶ 2). Instead, PBD's Kelly Street site was informally selected to be considered as an approved bakery manufacturer. Dunkin' also obtained a Consent and Release

to obtain a credit report on Gandy. (Docket No. 117 at DBI 12). Dunkin' then provided multiple documents to PBD related to the potential relationship, including: plans, models, equipment checklists and approval agreements. (Docket No. 109 at ¶ 5). Within these materials was a ten year profit and loss estimate titled "Hypothetical 10 year pro forma." (*Id.*). This document referenced potential revenues and profits to be generated by the approved bakery manufacturer but also contained, among other things, the following Financial Disclaimer:

> This financial analysis was developed using hypothetical expenses, sales and other figures. Dunkin' Donuts makes no projections or representations, express or implied as to current or future financial results, sales, shop penetration, advertising, market share or other aspects of this financial analysis.

(Docket Nos. 109 at ¶ 5; 119 at ¶ 5).

In September 2006, Johnson and Gandy traveled to Michigan with Green in order to view an operating Dunkin' commissary. (Docket Nos. 101 ¶ 35; 104 ¶ 24). Upon their return, Thompson contacted Hanson Design Group Limited in regards to preparing layout drawings for PBD's Kelly Street site. (Docket No. 117 at DBI 19-20). Around October 12, 2006, Hanson Design Group Limited prepared a layout drawing of the PBD facility and delivered the same, a copy of which was provided to Dunkin'. (Docket No. 117 at DBI 19-20).

*D. ABMA*

In October 2006, Dunkin' provided Thompson with an Approved Bakery Manufacturer Agreement ("ABMA") to be executed by Gandy as President of PBD. (Docket Nos. 101 at ¶ 37; 123 at ¶ 37; 104 at ¶ 26; 115 at ¶ 26). The ABMA was an arrangement between Dunkin' and PBD that outlined its duties as an approved bakery manufacturer. (Docket No. 104 at ¶ 27; 115 at ¶ 27). The ABMA, among other things, designated PBD as an approved supplier to manufacture

and deliver approved baked goods and other products to Dunkin' branded stores. (Docket Nos. 101 at ¶ 38; 104 at ¶ 27; 115 at ¶ 27; Def. Ex. O).

The initial term of the ABMA was projected as ten (10) years to end on December 31, 2016 with an automatic renewal term of an additional ten (10) years, if certain conditions specified in the ABMA were met. (Def. Ex. O at 2). As set forth in the Recitals portion of the ABMA, the stated purposes of the contract were that:

- Dunkin' "desires to designate an approved supplier that will manufacture and deliver approved baked goods and other products to Dunkin Donuts branded stores (the "Stores") from time to time designated by [Dunkin]. Most stores are independently owned and operated by [Dunkin's] franchisees."

- PBD "agrees to serve as such a supplier in accordance with the terms of this Agreement."

(*Id.*). The ABMA makes no mention of the fact that PBD did not have a facility at which to manufacture such products at the time of execution. It also contains no agreements, covenants, representations or warranties among the parties regarding the construction of such a facility. In all, the ABMA is silent as to construction of a commissary facility by PBD or any other person or entity. Instead, the focus of the ABMA is on PBD's manufacture of Dunkin' products in accordance with Dunkin's specifications and the supply of same to Dunkin' franchisees. To this end, the Agreement contained certain limitations, including that:

> E. Manufacturer [PBD] acknowledges that Manufacturer is granted no exclusive territory or service area under this Agreement.

> F. Manufacturer [PBD] acknowledges and agrees that Franchisor [Dunkin'] has made no commitment on its own behalf or on behalf of its franchisees to purchase, distribute, or to cause to be purchased or distributed any minimum amount of Products [donuts] or that Manufacturer's revenue will increase by a specified amount or percentage. To the extent that Franchisor may have provided Manufacturer with historical or estimated Product volumes, Franchisor will not be liable if Manufacturer's actual

sales are less than the amount stated in such data, forecasts or projections.

*ABMA*, § 2, ¶¶ E and F.

Additional provisions include an integration clause that states:

> This Agreement sets forth the entire understanding of the parties in connection with the subject matter hereof. No party has made or relied on any statement, representation or warranty in connection herewith except as expressly set forth herein. This Agreement may only be modified in writing and signed by both parties.

*Id.* at § 25.

A provision entitled "No Third Party Beneficiaries," provides that:

> Nothing in this Agreement shall be construed to give any person or entity other than the parties hereto any legal or equitable claim, right or remedy; rather, this Agreement is intended to be for the sole and exclusive benefit of the parties hereto.

*Id.* at § 24.

PBD was provided with the ABMA in December of 2006 for execution. (Docket Nos. 104 at ¶ 28; 115 at ¶ 28). On December 15, 2006, Gandy, as president of PBD, signed the ABMA on behalf of PBD. (Docket Nos. 101 at ¶ 39; 123 at ¶ 39; 104 at ¶ 28; 115 at ¶ 28; Def. Ex. O).[3] On or about January 4, 2007, Scott Murphy signed the ABMA on behalf of Dunkin'. (*Id.* at ¶ 40; *Id.* at ¶ 29; Def. Ex. O).

*E. Continuing Correspondence / Meetings*

PBD initially identified its Kelly Street facility in Homewood to be the site of the east commissary. (Docket Nos. 101 at ¶ 46; 104 at ¶ 35; Def. Ex. E (Gandy Dep. 103:25-104:12)). A meeting was held on February 15, 2007 between Thompson, PBD and several Dunkin'

---

[3]     PBD contends that although the ABMA was purported to have been signed by Gandy, the signature was, in fact, executed by Thompson. (Docket Nos. 115 at ¶ 28; Gandy Dep. 11/13/12 at 99:1-17). The Court notes that Gandy also testified at length concerning certain documents and checks that Thompson executed on his behalf during his time operating PBD. (Gandy Dep. (43:14-25-44:2-8)). Gandy disputes that such broad authorization was ever given to Thompson. (*Id.* at 44:9-14). In this Court's opinion, these disputes are not material to the disposition of any of the pending motions for summary judgment.

employees. (Doc. No. 109 at ¶ 8). Dunkin' admits only that a meeting was held on February 15, 2007, during which a list of "next steps" regarding the "PBD east facility" were discussed. (Docket No. 119 at ¶ 8). However, the record clearly demonstrates that, at the very least, a tentative timeline was debated whereby construction on the renovations of the facility would be commenced by June 4, 2007, and the commissary would be operational and supplying donuts to franchisees by November 5, 2007. (Docket Nos. 109 at ¶ 8; 117 at DBI 71). On February 21, 2007, in furtherance of the development of the Kelly Street facility, PBD entered into a contract with architect Marvin Miller. (Docket No. 115 at ¶ 32). Miller designed a layout for the placement of all necessary equipment in the facility, both the equipment then owned by PBD, as well as the equipment anticipated to be necessary to accomplish PBD's supply duties under the ABMA. (*Id.*).

The PSP progressed with representatives of PBD (including Thompson and Gandy, at times), participating in weekly meetings with Dunkin' at its request. (Docket Nos. 109 at ¶ 9; 119 at ¶ 9; Pl. Ex. A at DBI 89). From March 7, 2007 until the PSP was cancelled, Dunkin' representatives (including Allen Leonard and Troy Volk), were in communication with Thompson and the architects and contractors retained by PBD. (Docket No. 109 at ¶ 9). Their correspondence demonstrates that Dunkin' representatives were actively involved in reviewing plans for the construction or renovation of the commissary and providing comments regarding the same. (Docket No. 117 at DBI 89, 222, 309).

*F. Urban Redevelopment Association Funding and Heartland PCA*

Plaintiffs and PBD anticipated PBD obtaining funding from the URA to support the construction necessary to renovate and/or build the commissary facility. (Docket Nos. 109 at ¶ 4; 119 at ¶ 4; 117 at ¶¶ DBI 94-95). In order to secure URA financing, PBD was required to

demonstrate to the URA that franchisees anticipated executing Store Development Agreements with Dunkin' and Purchase Commitment Agreements ("PCA") with PBD, which stated that the franchisees would, in fact, purchase goods from PBD. (Docket No. 117 at DBI 173-174).

Thompson was provided with form letters and PCA agreements by members of Dunkin's legal department. (Docket Nos. 109 at ¶ 11; 119 at ¶ 11). On May 9, 2007, Thompson executed a PCA form and forwarded it to Ed Jaten of Heartland in an effort to have the same executed by Heartland. (*Id*.). Jaten did not execute this version of the PCA. (*Id*. at ¶ 12). Heartland was reluctant to execute the PCA because it was not confident that PBD would be capable of fulfilling the needs of the prospective franchisees. (Docket No. 117 at DBI 94-95, 143-145). As a result of Heartland's concerns, Dunkin' representatives proposed revisions to the PCA to include qualifying language under which Heartland would execute the PCA subject to Heartland entering into an SDA with Dunkin'. (*Id*. at DBI 175-197). The following language was then inserted into the revised PCA:

> This Agreement is contingent upon Heartland Coffee Company Pittsburgh, LLC executing a Store Development Agreement with Dunkin'.

(Docket No. 117 at DBI 197). On May 11, 2007, Chris Powers of Dunkin' sent a copy of the revised PCA to Jaten. (Docket No. 117 at DBI 141). Heartland did not immediately respond. (*Id*.).

### G. Ensuing Problems with the Site and Financing

In early May 2007, a representative of Heartland visited the proposed Kelly Street location and was dissatisfied. (Docket Nos. 101 at ¶ 47; 123 at ¶ 47; 104 at ¶ 36; 115 at ¶ 36). The Heartland representative notified Dunkin' that Kelly Street would not be acceptable for Heartland's baking needs and that Heartland would therefore not enter into a Store Development

Agreement. (*Id.*). On or about May 9, 2007, representatives of Dunkin' discussed with Thompson the possibility of finding a new location for the east commissary. (Docket Nos. 101 at ¶ 48; 123 at ¶ 48; 104 at ¶ 37; 115 at ¶ 37). At this time, Thompson proposed a new location on Braddock Street. (Docket Nos. 101 at ¶ 49; 123 at ¶ 49; 104 at ¶ 37; 115 at ¶ 37).

Thompson told Dunkin' on May 12, 2007 that Gandy could no longer participate in the PSP because he was unable to obtain additional financing for a new location for the east commissary. (Docket Nos. 101 at ¶¶ 49, 52; 123 at ¶¶ 49, 52; 104 at ¶¶ 38, 41; 115 at ¶¶ 38, 41). There is a dispute between the Plaintiffs and Dunkin' regarding which of the parties proposed finding individuals to replace Gandy in the PSP. Plaintiffs claim that Dunkin' asked Thompson to find partners who could replace Gandy. (Docket Nos. 109 at ¶ 30; 119 at ¶ 30). Conversely, Dunkin' suggests that Thompson recommended that Lak and Johnson replace Gandy and PBD in the PSP. (Docket Nos. 101 at ¶ 49; 123 at 49; 119 at ¶ 30; 107, Def. Ex. A (Thompson Depo. 130:20-131:19)).

On June 6, 2007, Jaten emailed Dunkin' a signed copy of the revised PCA. (Docket No. 117 at DBI 193-197). However, numerous spaces in the PCA were left blank, including: the line marked Date (the "Effective Date."); the Manufacturer Address; the Store Address; and the line marked Store above Jaten's signature. (*Id*. at DBI 193). While PBD points to a version of the revised PCA which is not executed by Thompson, Gandy or PBD at summary judgment, (*id.* at DBI 197), a version of this agreement purportedly executed by Thompson on behalf of PBD is attached to PBD's Third Amended Complaint, (*see* Docket No. 48-1). Again, this revised version of the agreement contained the provision stating that the revised PCA was "contingent upon Heartland executing a SDA with Dunkin." (Docket Nos. 117 at DBI 197; 48-1).

*H. Formation of F&J and Failed Purpose of PBD*

F&J was formed by Johnson and Lak in July 2007 to replace PBD in the PSP. (Docket Nos. 101 at ¶ 53; 123 at ¶ 53; 104 at ¶ 42; 115 at ¶ 42). Plaintiffs claim that F&J requested a new ABMA agreement from Dunkin' in order to formally take PBD's place and run the east commissary. (Docket No. 101 at ¶ 54; Def. Ex. A (Thompson Dep. 138:23-139:22); Def. Ex. F (Johnson Dep. 145:9-146:15)). Thompson and Johnson testified that Dunkin' refused to execute a new ABMA agreement. (*Id.*). They maintain that Dunkin' told them to buy out PBD and acquire its ABMA through the transaction. (*Id.*).

Per Plaintiffs, F&J had an agreement in principle with Gandy to buy PBD for $750,000. (Docket No. 101 at ¶ 57; Def. Ex. A (Thompson Dep. 141:10-143:12, 136:21-147:8); Ex. F (Johnson Dep. 43:4-20)). The vast majority of the $750,000 was to pay PBD's and Gandy's debts, including $375,000 to pay off PBD's then outstanding debt to Schneider Dairy and $220,000 to pay off the mortgage on the Kelly Street property. (*Id.*; Def. Ex. A (Thompson Dep. 140:10-143:10)). In all, Gandy would personally profit approximately $50,000 from the purchase price. (*Id.*). The acquisition of PBD and F&J never transpired because Gandy refused to finalize the sale of PBD to Johnson and Lak unless Gandy was provided a thirty-five percent (35%) ownership share in F&J. (Docket Nos. 101 at ¶ 58; 123 at ¶ 58; 104 at ¶ 43; 115 at ¶ 43; Def. Ex. A (Thompson Dep. 145:15-146:13; 436:2-9); Def. Ex. F (Johnson Dep. 43:10-24); Def. Ex. D (Gandy Dep. 88:25-89:13)). Johnson and Thompson testified that Gandy's ownership interest in F&J was an *ex post facto* change to their agreement. (Docket Nos. 101 at ¶ 58; 104 at ¶ 44; Ex. A (Thompson Dep. 138:23-139:22); Ex. F (Johnson Dep. 43:4-24)). Gandy explained that he refused to enter into the agreement because he would continue to have the same amount of debt but would have no position in the continuing PSP. (Docket No. 115 at ¶ 43).

Despite the failed agreement, the commissary project continued, with Plaintiffs taking a more active role. On July 26, 2007, F&J entered into a lease with Berger Investments for the Braddock Avenue property, effective August 1, 2007. (Docket No. 119 at ¶ 32). Thompson signed the lease on behalf of F&J d/b/a PBD. (Def. Ex. W). Dunkin' admits that its representative Leonard visited the property prior to execution of the lease. (Docket Nos. 109 at ¶ 32; 119 at ¶ 32). The parties dispute the dates upon which certain other events occurred. PBD entered into a $1.4 million demolition contract with Ken Cuccaro and CCR to demolish the Braddock Avenue property. (Docket Nos. 109 at ¶¶ 32-33; 119 at 32-33). While the document is dated June 19, 2007, Dunkin' contends that it was not created until after August 6, 2007. (Docket No. 119 at ¶ 33). Dunkin' was advised by its consultant Green that as of July 9, 2007, demolition of the Braddock Avenue site had commenced and that PBD had incurred costs of at least $175,000. (Docket Nos. 109 at ¶ 32; 119 at ¶ 32). But, Dunkin' disputes that any demolition ever occurred. (Docket No. 119 at ¶ 32).

I. *Frozen Technology*

In June 2007, Dunkin' was developing a frozen donut process, known as Iditarod. (Docket Nos. 109 at ¶ 14; 119 at ¶ 14). Rather than using approved bakery manufacturers to produce fresh donuts for franchisees, Iditarod involved the production of frozen donuts, which were delivered to franchisees and thawed prior to sale to customers. (*Id.*). In a meeting on July 10, 2007, multiple Dunkin' executives discussed the successful development of the frozen donut process and technology and the potential adoption of such process in a number of markets, including Pittsburgh. (Docket Nos. 109 at ¶ 16; 119 at ¶ 16). Despite the subject matter of the meeting, there was no attempt to inform the Plaintiffs of the development of the Iditarod technology at that time. (*Id.*). Internal Dunkin correspondence shows that once Iditarod was

introduced, a decision was made that it would be utilized in the Pittsburgh market because the use of the frozen donuts would simplify business and save twenty percent (20%) on the cost of donuts for franchisees. (Docket Nos. 109 at ¶ 29; 119 at ¶ 29). Once this decision was made, Dunkin' representatives engaged in a debate regarding how that information would be transmitted to PBD and Thompson. (Docket Nos. 109 at ¶ 17; 119 at ¶ 17).

To this end, on July 16, 2007, Joseph Koudelka asked Scott Murphy when the frozen donut process would be discussed with PBD, and pointed out that PBD would be "spending big money soon", in pursuit of the PSP. (*Id.*). In late July, Heartland was made aware of the Iditarod process by Dunkin'. (Docket Nos. 109 at ¶ 16; 119 at ¶ 16; Def. Ex. 9 (Jaten Dep. at 26:22-27:8); Def. Ex. 10 (Murphy Dep. at 59:12-60:21)). Heartland did not decide to utilize the frozen technology until at least August 2007. (*Id.*; *see also* Def. Ex. 9 (Jaten Dep. at 31). Dunkin' was informed by Michael Orie, a representative of Heartland, that Heartland wanted Dunkin' to be the one to inform the Plaintiffs that the frozen donut process was available as an option. (Docket Nos. 109 at ¶ 20; 119 at ¶ 20).

Throughout this timeframe, Thompson had made repeated requests of Dunkin' to provide him with an approved layout plan for the commissary. (Docket Nos. 109 at ¶¶ 18-19; 119 at ¶¶18-19). As of July 24, 2007, the approved plan had not been provided and Thompson made yet another request. (*Id.*). Internal emails from Dunkin' show that Rheaume subsequently asked Koudelka and Murphy whether he (Rheaume) should have Volk "make up some reason to redraw the plan." (*Id.*). The record demonstrates that no one from Dunkin' provided Thompson with an approved plan or requested that it be redrawn at that time. (Docket No. 119 at ¶ 19).

*J. Plaintiffs Told to Stop Work*

16

As late as August 3, 2007, representatives of Dunkin' had yet to advise PBD that the PSP would not be utilized because of the Iditarod solution. On August 7, 2007, Koudelka sent a letter to Thompson serving as confirmation of their conversation that allegedly took place on August 6, 2007. (Docket Nos. 109 at ¶ 25; 119 at ¶ 25). The letter states as follows:

> During the call we informed you that a new and alternative donut production technology is being tested and being considered for release into our system. As a result of this development, we asked that you discontinue all construction and related activity surrounding your manufacturing facility that was related to Dunkin' Donuts production. We also asked that you compile all costs incurred to date related to the Dunkin' project and forward to me with appropriate supporting documentation.
>
> While neither Dunkin' Brands nor our franchisee have made a final decision to change the course of our present production plans, we are attempting to gather all relevant data to make the proper decision for our franchisees and our Brand. We would appreciate you providing this to us as soon as possible.

(Pl. Ex. B).

Although the letter states the conversation between Thompson and Koudelka took place on August 6, 2007, Thompson testified that he believed it occurred on either August 7 or August 8, 2007. (Docket Nos. 101 at ¶ 61; 123 at ¶ 61; Def. Ex. A (Thompson Dep. 418:23-419:3)). These communications represented the first time that any of the Plaintiffs had been advised of the possibility that Dunkin' was not proceeding with the PSP. (Docket Nos. 109 at ¶ 25; 119 at ¶ 25). Thompson submitted the requested cost information to Dunkin' but claims he never received a response while Dunkin' points out that a response was sent through its attorneys in 2008. (Docket Nos. 109 at ¶ 34; 119 at ¶ 34).

### K.  Thompson's Testimony and Affidavits Related to Thompson's Testimony

Thompson was deposed at length during discovery, at three separate sessions: August 16, 2012, November 12, 2012 and November 8, 2013.  (*See* Def. Exs. A, B, C).  He testified

repeatedly that he knew "right from the beginning" that there was something wrong with the PSP and that there was a pattern "all the way up" that led him to suspect that the PSP would not come to fruition. (Docket No. 101 at ¶¶ 27-28; Def. Ex. A (Thompson Dep. 207:6-10; 208:13-14); Def. Ex. B (Thompson Dep. 183:22-184:1)). He added that he believed from the outset that Dunkin' had no intention of ever having the east commissary built by PBD or going through with the PSP. (*Id*. at ¶ 29; Def. Ex. A (Thompson Dep. 33:17-25; 42:22-43:5; 89:15-21; 90:23-91:3)). Upon questioning, Thompson confirmed that he felt that the deal would not go through at a number of different stages of the project, including:

- June 2006, when Thompson told Jim Green that Gandy was not capable of doing even one commissary. (Docket Nos. 101 at ¶¶ 26, 33; 104 at ¶¶ 14, 15);

- June 2006, when the URA questioned why Dunkin' did not approach them first. (Docket Nos. 101 at ¶ 34; 104 at ¶ 23);

- Dunkin' entering into a project with two individuals, Gandy and Lak, who had tax liens and other credit problems (Docket Nos. 101 at ¶ 31; 104 at ¶ 19);

- September 2006, after Johnson and Gandy visited an operating Dunkin' commissary in Michigan which far exceeded PBD's facility in size, scope and capabilities. (Docket No. 101 at ¶¶ 35-36);

- March 2007, after Dunkin' sent equipment specifications to PBD that read "North Carolina and South Carolina." (*Id*. at ¶¶ 44-45; 104 at ¶¶ 24-25).

- Dunkin' approved PBD as a supplier even though the Kelly Street building was in such poor condition. (Docket Nos. 101 at ¶ 41; 104 at ¶ 30);

- Dunkin' not objecting to the delay caused when architect Marvin Miller took a month-and-a-half off of the project. (Docket Nos. 101 at ¶ 43; 104 at ¶ 32);

- Dunkin's delay in approving a generator for the bakery. (*Id*.);

- Dunkin' pricing the donuts at a flat rate of $2.25 per dozen (*Id.*);

- Dunkin' not offering to reimburse Gandy for his expenses when he could not continue with the PSP. (Docket Nos. 101 at ¶ 50; 104 at ¶ 39); and

- May 2007, when Thompson was told by Ken Cuccaro, who had heard from certain contacts that the PSP was not going to go through. (Docket Nos. 101 at ¶ 51; 104 at ¶ 40).

(*See also* Def. Exs. A, B, C).

On January 27, 2014, Gandy submitted an affidavit addressing Thompson's testimony in response to Dunkin's Motion for Summary Judgment. (Docket No. 116). Gandy indicated that he reviewed Thompson's testimony about his skepticism, including Dunkin's intent to complete the PSP. (*Id.* at ¶ 1). Gandy swore that at no time did Thompson ever express any such skepticism to him during the development of the PSP or afterward. (*Id.*at ¶ 2). Finally, Gandy stated that when he was present at meetings regarding the PSP, Thompson was always positive about pursuing the PSP with Dunkin' and appeared confident that Dunkin' was also proceeding with it. (*Id.* at ¶ 3).

On February 25, 2014, Plaintiffs filed a Sur-Reply brief that included a sworn affidavit by Thompson. (Docket No. 131-1). Plaintiffs argue that they submitted the affidavit because Thompson wanted to clarify his prior deposition testimony, which he felt was taken out of context by Dunkin' but such explanation is not set forth in the affidavit itself. (Docket Nos. 131, 134). In his sworn affidavit, Thompson maintains that at all times during the development of the PSP, he believed that Dunkin's involvement in the project was legitimate and would eventually lead to commissaries being built in the Pittsburgh area. (Docket No. 131-1 at ¶ 1). Additionally, Thompson swears that all of the representations he made to the URA and City, County and State elected officials in an effort to gain additional financing and support were based on this belief.

(*Id*. at ¶ 3).  Thompson also states that all of the actions he took on behalf of himself, F&J, PBD and Lok Bakery were based on the belief that these efforts would lead to the completion of said bakeries and an on-going business relationship with Dunkin' and its franchisees. (*Id*. at ¶ 2). Thompson admitted that there were some problems and concerns along the way.  However, Thompson saw these as mere obstacles to be overcome, (*Id*. at ¶ 4), because prior to approximately August 7, 2007, it was Thompson's belief that Dunkin's intended expansion required construction of the commissaries and that Dunkin' had no other options. (*Id*. at ¶ 6).

### L.  Damages Evidence

The parties dispute the sufficiency of the damages evidence presented by Plaintiffs and PBD.  Although the Court finds that the disputes on damages need not be resolved as summary judgment in favor of Dunkin' is warranted on the liability issues, *see* § V, *infra*, the Court briefly summarizes the damages claims.

Plaintiffs seek total damages of $2,832,545.33.  (Docket Nos. 101 at ¶ 70; 123 at ¶ 70). Such figure includes the following alleged losses:

- $1,681,545 to Cuccaro Plumbing and Construction/CCR, for breach of a contract to demolish Braddock Avenue property and related expenses;

- $60,000.00 for Berger Investment, a firm which leased F&J the Braddock Avenue property;

- $600,000.00 for Charles Thompson Consulting Fees;

- $135,000.00 for Kimball & Associates, an architectural firm, for design services associated with Braddock Avenue construction and related expenses;

- $50,000.00 for Marvin Miller's architectural services;

- $40,000.00 for Derrick Johnson's lost wages;

- $9,400.00 for loans allegedly made by Derrick Johnson to PBD;

- $65,800.00 for Derrick Johnson's out of pocket expenses for purchases and travel;

- $93,666.25 for Michael Howard Roofing and Fencing;

- $50,000.00 for F&J's attempted purchase of PBD;

- $100,000.00 for an advance allegedly made by Charles Thompson to PBD;

- $2,212.71 for Infinity Construction;

- $10,000.00 to Kim Johnson, Charles Thompson's girlfriend and Derrick Johnson's sister;

- $5,450.00 to Marcor Asbestos Co. for Braddock Avenue asbestos removal;

- $2,459.00 to Pittsburgh Water and Sewage Authority for services at Kelly Street property.

(Docket Nos. 101 at ¶¶ 71-187; 123 at ¶¶ 71-187). PBD seeks a lesser amount, $579,000.00, but believes that funds are owed to many of the same payees for which Plaintiffs are seeking compensation and for the same type of services allegedly rendered in furtherance of the project. (Docket Nos. 104 at ¶¶ 48-111; 115 at ¶¶ 48-111).

III. PROCEDURAL HISTORY

On May 18, 2012, this Court issued a Memorandum Opinion granting, in part and denying, in part, Dunkin's Motions to Dismiss both Plaintiffs' and Intervenor Plaintiffs PBD and Gandy's Amended Complaints. (Docket No. 41). In this decision, Plaintiffs' race discrimination claim was dismissed, with prejudice, and their promissory estoppel claim was dismissed, without prejudice. (*Id.*). The Court also denied Dunkin's Motion to Dismiss Intervenor Plaintiffs' promissory estoppel claim but granted its Motion to Dismiss their race discrimination claim, without prejudice. (*Id.*).

After this Court's Opinion was issued, the Plaintiffs and PBD filed Second Amended Complaints setting forth only promissory estoppel claims against Dunkin'. (Docket Nos. 43, 44). PBD did not allege any race discrimination claims against Dunkin' in its Second Amended Complaint and Gandy no longer advanced any claims against Dunkin'. (Docket No. 44). PBD later filed a Third Amended Complaint setting forth the same causes of action but clarifying certain allegations. (Docket No. 48). Dunkin' responded by filing Answers to both pleadings. (Docket Nos. 50, 51). The case then proceeded to discovery and the parties participated in the Court's Alternative Dispute Resolution Program, through which the case was not resolved. (Docket Nos. 59, 60, 65).

Near the conclusion of discovery, the parties advised the Court at a status conference that further settlement efforts would not be fruitful and requested that summary judgment deadlines be set. Dunkin' then filed Motions for Summary Judgment as to both Plaintiffs' and PBD's claims. (Docket Nos. 99, 102). In turn, Plaintiffs filed a Partial Motion for Summary Judgment. (Docket No. 105). Pursuant to the Court's deadlines, and as is detailed below,[4] the parties

---

[4] The relevant filings as to Dunkin's Motion for Summary Judgment in regards to Plaintiffs' promissory estoppel claim are as follows. On December 18, 2013, Dunkin' filed its Motion for Summary Judgment; Concise Statement of Material Facts; Appendix and Brief in Support for both Plaintiffs and PBD. (Docket Nos. 99-104, 107-108). Plaintiffs responded with a Memorandum in Opposition; Response to Dunkin's Concise Statement of Material Facts; and Appendix on January 28, 2014. (Docket Nos. 122-124). Dunkin' filed a Reply Brief on February 18, 2014. (Docket No. 129). Plaintiffs followed up with a Sur-Reply Brief on February 25, 2014. (Docket No. 131). Dunkin' then filed a Motion to Strike Exhibits to Plaintiffs' Sur-Reply Brief on March 3, 2014, (Docket No. 132), to which Plaintiffs submitted their Response to Dunkin's Motion to Strike on March 10, 2014. (Docket No. 134).

With respect to Plaintiffs' Partial Motion for Summary Judgment, the parties' submissions are summarized here. On December 18, 2013, Plaintiffs filed their Motion for Summary Judgment; Brief in Support; Concise Statement of Material Facts; and Appendix (Supplemental Statement of Facts). (Docket Nos. 105-106, 109). Dunkin' countered on January 28, 2014 with its Brief in Opposition; Response to Plaintiffs' Concise Statement of Material Facts; and its own Appendix. (Docket Nos. 118-121). Plaintiffs did not submit a Reply Brief.

Finally, the parties' filings as to Dunkin's Motion for Summary Judgment challenging PBD's promissory estoppel claim include the following. On December 18, 2013, Dunkin' filed its Motion for Summary Judgment; Concise Statement of Material Facts; Appendix and Brief in Support. (Docket Nos. 104-108). PBD responded by filing its Memorandum in Opposition; Response to Dunkin's Concise Statement of Material Facts; Affidavit in Opposition; and Appendix on January 27, 2014. (Docket Nos. 114-117). Dunkin' then filed a Reply Brief in

exhaustively briefed the motions for summary judgment. (Docket Nos. 99-134). Relatedly, Dunkin' filed a Motion to Strike challenging certain evidence presented by Plaintiffs, to which Plaintiffs filed a Brief in Opposition. (Docket Nos. 132, 134).

On April 1, 2014, the parties advised the Court that the matter could be submitted on the briefs and consented to the Court's cancellation of a previously scheduled motion hearing. (*See Text Order 4/1/14*). Accordingly, the parties' Motions have now been fully briefed and are ripe for disposition.

IV. LEGAL STANDARD

The legal standard governing motions for summary judgment is well-settled. To this end, Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine dispute of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

---

Support of its Motion and an "Additional Response of PBD as to Damages" on February 18, 2014. (Docket Nos. 128, 130). No Sur-Reply Brief was submitted by PBD.

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

V.  DISCUSSION

Presently before this Court are three related Motions for Summary Judgment arguing the parties' positions as to the sufficiency of the promissory estoppel claims brought by Plaintiffs and PBD. (Docket Nos. 99; 102; 105). To this end, Dunkin' seeks summary judgment against Plaintiffs and PBD on both liability and damages issues, while Plaintiffs seek Partial Summary Judgment against Dunkin' as to liability, only. (Docket Nos. 100, 103, 106). Dunkin' has also filed a Motion to Strike challenging certain of the evidence presented by Plaintiffs, which they oppose. (Docket Nos. 132, 134). For the reasons more fully explained below, the Court finds that there are no genuine disputes of material fact and that summary judgment should be entered in favor of Dunkin' and against Plaintiffs and PBD because no reasonable jury could find Dunkin' liable for the promissory claims that have been asserted based on the evidence of record. As a consequence, the Court need not reach the damages issues raised by Dunkin' in its Motions for Summary Judgment.

Before directly addressing same, the Court turns to Dunkin's related Motion to Strike and Plaintiffs' opposition thereto.  (Docket Nos. 132, 134).

*A. Dunkin's Motion to Strike*

Dunkin's Motion to Strike challenges certain evidence submitted by Plaintiffs for the first time as attachments to their Sur-Reply Brief, including an affidavit by Thompson and evidence purportedly supporting their damages claims.  (Docket No. 132).  Only Thompson's affidavit is relevant to the disposition of the Motions for Summary Judgment to the extent that it bears on the liability issues in dispute between Dunkin' and Plaintiffs. (*See* Docket No. 131-1).  Dunkin' maintains that Thompson's affidavit should be stricken under the sham affidavit doctrine while Plaintiffs argue that the affidavit may be properly considered by the Court in resolving the merits of the pending Motions for Summary Judgment.  (Docket Nos. 132, 134).

The United States Court of Appeals for the Third Circuit has explained that:

> [a] sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purposes of defeating summary judgment.  A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant…. [I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

*Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d. Cir. 2007).  However, "not all contradictory affidavits are necessarily shams" and "when there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit."  *Id.* at 254 (citing *Baer v. Chase*, 392 F.2d 609, 625 (3d. Cir. 2004)).

In deciding whether an affidavit is a sham and should be disregarded, the Court of Appeals instructs lower courts to apply a "flexible approach" and consider the totality of the circumstances.  *See EBC, Inc. v. Clark Bldg. Systems, Inc.*, 618 F.3d 253, 269 (3d Cir. 2010).  Among the relevant factors, this Court should evaluate: whether the information provided in the

affidavit is contradictory; the importance of the matter on which the individual changes his or her testimony; if the timing of the affidavit is questionable; and, whether there is any corroborating evidence to explain the contradiction. *See Jiminez*, 503 F.3d at 253-254; *see also EBC*, 618 F.3d at 269-270. Applying these factors to the present situation, the Court concludes that Thompson's affidavit is a sham and should be disregarded because the statements in his affidavit squarely contradict his prior deposition testimony, were made regarding critical points in this litigation and the timing of the affidavit is highly questionable.

Prior to discovery, this Court issued a Memorandum Opinion fully articulating that one of the essential elements of the Plaintiffs' and PBD's promissory estoppel claims was whether they reasonably relied on the promises purportedly made to them by Dunkin'. (Docket No. 41 at 16). As the Court indicated in its decision, absent reasonable reliance on the promise by the promissee, a cause of action for promissory estoppel cannot succeed under Pennsylvania law. (*Id.*). The Court further recognized that reasonable reliance must be proven by clear and convincing evidence and "cannot be established by mere proof that a sophisticated individual made a decision based on his own business judgment, rather than relied on an express promise by the promisor." (*Id.* at 24). During discovery, Dunkin' deposed Thompson at length, on three separate occasions, posing numerous questions to him on these precise points in an effort to discover evidence of whether Plaintiffs' and PBD's actions were undertaken with reasonable reliance on Dunkin's purported promises made under the PSP to have its franchisees enter into agreements to purchase fresh donuts and baked goods from PBD if a commissary facility was built or if PBD's actions resulted from calculated business decisions made by Thompson and/or Gandy. (*See* Def. Exs. A, B, C). In this Court's opinion, Thompson's later affidavit clearly

contradicts his earlier testimony on these issues which are central to the litigation. (*See* Docket No. 131-1).

For example, Thompson testified several times under oath that he believed from the outset that Dunkin' had "no intention" of ever having the east commissary built by PBD or otherwise going through with the PSP. (Docket No. 101 at ¶ 29). Thompson added that he knew "right from the beginning" that there was something wrong with the PSP and that there was a pattern "all the way up" that led him to suspect that the PSP would not come to fruition. (Docket No. 101 at ¶¶ 27-28). In stark contrast to this earlier sworn testimony, Thompson states in his affidavit that, at all times throughout the development of the PSP, he believed Dunkin's involvement was legitimate and that the PSP would eventually lead to the completion of commissaries in the Greater Pittsburgh Area. (Docket No. 131-1 at ¶¶ 1-3). He also avers that there were certainly problems with the project which caused him concerns but he felt that these were merely obstacles that would be overcome and did not undermine his belief that the commissaries would be built. (*Id.* at ¶¶ 4-5). Thompson adds that all of the actions he took in furtherance of the PSP, including arranging financing through the URA and City officials and entering into subcontracts, were undertaken because of his belief in the ultimate consummation of the project. (*Id.* at ¶¶ 3, 7-8).

The Court of Appeals has cautioned lower courts to avoid narrowly reading deposition testimony and broadly considering the later information in the affidavit when determining whether such evidence is contradictory. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Further, mere discrepancies between the two statements should not be viewed as contradictory. *See EBC*, 618 F.3d at n.17. Yet, this Court must conclude that Thompson provided information in his affidavit which "squarely contradicts" his earlier

deposition testimony because the statements all concern Thompson's belief of Dunkin's motives and intent while the project was ongoing.  *Id.* at 268.

The Court next finds that Thompson has not presented any evidence explaining the variances and discrepancies between the two versions of his recollection of the facts because the later affidavit does not address his change of position.  (*See* Docket No. 131-1).  Instead, Plaintiffs' counsel admits that the information is contradictory[5] but argues that the statements made during Thompson's earlier deposition testimony were "emotional statements years after the events surrounding this litigation and attempts to put them in context with his litany of actions that themselves contradict his emotional statements some four years later."  (Docket No. 134 at ¶¶ 5-6).  Plaintiffs' counsel adds that "the statements were emotional responses to a great feeling of betrayal that the Plaintiffs feel as a result of this plan."  (*Id.* at ¶ 6).  But, there is no record *evidence* from Thompson supporting this purported explanation proffered by his counsel.  Hence, the Court will exercise its discretion to disregard the unsubstantiated explanation.  *See EBC*, 618 F.3d at 268 ("Our sham affidavit cases … permit courts to ignore affidavits that contradict earlier deposition testimony without adequate explanation.").

The record also contains no significant corroborating evidence of Thompson's later statements setting forth his purported belief that Dunkin' always intended to go forward with the PSP.  At most, Gandy explains in an affidavit that Thompson never communicated his concerns about Dunkin's intentions directly to him during the project and always felt that Thompson believed in the project.  (Docket No. 116).  But, Gandy admits that he relied on Thompson's superior business acumen and deferred to him on all matters concerning the PSP.  (Docket No.

---

[5]     "It is admitted that multiple times during his deposition, Charles Thompson made statements evidencing a belief that there was a problem with Dunkin's Pittsburgh Supply Plan in that his testimony often included language along the lines that Dunkin' never intended to go through with the Pittsburgh Supply Plan."  (Docket No. 134 at ¶ 6).

104 at ¶¶ 8-9 ("[PBD] was my business, but I entrusted it to Charles Thompson. He was the one that did everything. I really didn't stay on top of it because I trusted him.")). So, the evidence from Gandy, as with any evidence of actions undertaken by Thompson on behalf of PBD during the PSP, does not undermine the fact that Thompson testified, repeatedly, that he did not believe during the project that Dunkin' intended to carry the deal with PBD forward to completion.

Finally, and importantly, the timing of the affidavit is highly questionable because it was made by Plaintiffs in conjunction with the last brief associated with the pending Motions for Summary Judgment as it was attached to Plaintiffs' Sur-Reply Brief filed on February 25, 2014. (Docket No. 131-1). Thompson was deposed by Dunkin' during three separate sessions on August 16, 2012, November 12, 2012 and November 8, 2013 but took no action to repudiate or clarify his testimony in the intervening period. (Def. Ex. A, B, C; Docket No. 101 at ¶¶ 27-28). He also did not submit his affidavit in conjunction with Plaintiffs' Motion for Summary Judgment filed on December 18, 2013 or Plaintiffs' Response in Opposition to Dunkin's Motion for Summary Judgment filed on January 28, 2014. (Docket Nos. 105, 106, 109; 122-124). As a consequence, Thompson literally submitted the affidavit at the eleventh hour and the only reasonable inference to be drawn from such timing is that it was submitted solely for the purpose of attempting to avoid the entry of summary judgment against his position in this litigation. *Jiminez*, 503 F.3d at 253. "[T]he objectives of summary judgment would be seriously impaired" if the affidavit was not stricken in light of all of these circumstances. *See Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705-06 (3d Cir. 1998); *see also EBC*, 618 F.3d at 269 (quoting same).

For these reasons, Dunkin's Motion to Strike [132] is granted and the Court will not consider Thompson's sham affidavit in determining whether there are genuine disputes of material fact precluding the entry of summary judgment in this case.

### B. Promissory Estoppel Claims

With that ruling, the Court next addresses the parties' Motions for Summary Judgment arguing the sufficiency of the promissory estoppel claims under Pennsylvania law.[6] (Docket Nos. 99, 102, 105). To maintain a promissory estoppel action under Pennsylvania law:

> [T]he aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute. Thus, as promissory estoppel makes otherwise unenforceable agreements binding, the doctrine sounds in contract law....

*Guerra v. Redevelopment Authority of City of Philadelphia*, 27 A.3d 1284, 1292 (Pa. Super. Ct. 2011) (quoting *Crouse v. Cyclops Industries,* 560 Pa. 394, 403 (Pa. 2000) (internal citation omitted)).

> Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment.

*Crouse v. Cyclops Industries*, 560 Pa. 394, 402-403 (Pa. 2000) (citing RESTATEMENT (SECOND) CONTRACTS § 90; *Shoemaker v. Commonwealth Bank,* 700 A.2d 1003, 1006 (Pa. Super. Ct. 1997)).

---

[6]     The parties do not dispute that Pennsylvania law applies to these claims. (*See* Docket No. 41 at 16).

The elements of promissory estoppel are "(1) misleading words, conduct or silence by the party against whom the estoppel is asserted; (2) unambiguous proof of reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel." *Thomas v. E.B. Jermyn Lodge No. 2*, 693 A.2d 974, 977 (Pa. Super. Ct. 1997). These elements "must be established by 'clear and convincing' evidence." *CONRAIL v. Foster Wheeler Envtl. Corp.*, CA Nos. 99-1642 and 99-1682, 2000 WL 1367943, at *15 (E.D. Pa. Sept. 20, 2000)).

To succeed on a promissory estoppel claim, the plaintiff must further establish that the action he took "amounted to a substantial change of position." *Luther v. Kia Motors Am., Inc.*, 676 F. Supp. 2d 408 (W.D. Pa. 2009) (quoting *Ankerstjerne v. Schlumberger Ltd.*, 155 F. App'x. 48, 51 (3d Cir. 2005). A claim for promissory estoppel "cannot survive when the plaintiff's actions were based on 'his own will and judgment' rather than the defendant's representations." *Josephs v. Pizza Hut of America, Inc.*, 733 F. Supp. 222, 227 (W.D. Pa. 1989), *aff'd*, 899 F.2d 1217 (3d Cir. 1990).

i.  Parties' Arguments

Dunkin' has set forth slightly different arguments challenging the sufficiency of the evidence supporting the promissory estoppel claims brought by Plaintiffs and PBD.[7] (Docket Nos. 99, 102). In this regard, Dunkin' has conceded, for purposes of summary judgment, that the PSP was an actionable promise made to PBD and focuses its arguments on whether PBD took actions in reasonable reliance on such promise. (Docket No. 103). As to Plaintiffs' claim, Dunkin' maintains that no promises were ever made to Thompson, Johnson or F & J and alternatively contends that even if the record contains such a promise, the Plaintiffs did not

---

[7]    As the Court previously noted, Dunkin' also argues that the evidence as to certain damages claimed by PBD and Plaintiffs is not supported. However, as the Court will enter summary judgment in Dunkin's favor on the liability issues, the damages issues need not be resolved.

reasonably rely on same. (Docket No. 100). In opposition, Plaintiffs and PBD argue that there are genuine disputes of material fact and that their respective claims are sufficiently supported by the record to advance to trial. (Docket Nos. 114, 122). Plaintiffs further contend that summary judgment is properly entered in their favor based on the undisputed facts in the record. (Docket No. 106). For convenience, and to the extent possible, the Court will analyze the separately filed motions together along with the elements of the promissory estoppel theories.

ii.    Dunkin's Alleged Promises to Plaintiffs

Dunkin' argues that there is no genuine dispute of material fact that it never made any actionable promises to the Plaintiffs, but at most, made a promise to do business with PBD through its agents, Thompson and Johnson, during the PSP. (Docket No. 100). Plaintiffs counter that the record contains sufficient evidence of a promise made to them by Dunkin', citing the PSP, projections contained in the "Hypothetical ten year pro forma" document produced by Dunkin', the ABMA, and the course of conduct between the parties such that Dunkin' was aware that Thompson and Johnson had entered into agreements with third parties including contracts for architectural services, renovations and lease agreements. (Docket No. 122).

To maintain a promissory estoppel action under Pennsylvania law, the aggrieved party must show that the promisor made a promise to the promisee which the promisor understood would induce action on behalf of the promisee. *See Guerra*, 27 A.3d at 1284. The United States Court of Appeals for the Third Circuit has recognized that Pennsylvania law requires an "express promise" by the promisor to the promisee rather than vague, implied promises which are not sufficient to sustain a promissory estoppel cause of action. *See C & K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988). In order to determine the promisor-promisee relationship in this case, the Court must initially look to general principles of agency law. *See*

*Josephs*, 733 F. Supp. at 226-27. It is well settled that to establish an agency relationship under Pennsylvania law, the basic elements are "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking. Additionally, an agent is not personally liable for contracts that it enters on behalf of the disclosed principal." *Bennett v. Itochu Intern., Inc.*, 682 F. Supp. 2d 469, 477-78 (E.D. Pa. Jan. 25, 2010) (citing *Basile v. H & R Block, Inc.*, 563 Pa. 359, 761 A.2d 1115, 1120 (2000)).

In this Court's estimation, viewing the evidence in the light most favorable to Plaintiffs, there is no genuine dispute of material fact that Thompson and Johnson acted as agents of PBD throughout the dealings with Dunkin' such that an agency relationship was formed under Pennsylvania law. *See id.* To this end, the principal of PBD, Gandy, clearly manifested his intent that Thompson was authorized to act on behalf of PBD. *See Bennett*, 682 F. Supp. 2d at 477. Indeed, Gandy admits that Thompson was PBD's agent,[8] testified that he relied on Thompson to run PBD's business and even deferred to his business decision-making based on his (Gandy's) belief that Thompson possessed superior business acumen to his own. (Docket Nos. 104 at ¶¶ 8-9; 115 at ¶¶ 8-9). It is also clear that Thompson understood and accepted that he was such an agent and Johnson likewise acknowledged that Thompson had engaged him to do work on behalf of PBD. In this regard, Thompson and Johnson both admit that they were acting as independent contractors or consultants for PBD. (Docket No. 101 at ¶¶ 5, 14; 123 at 5, 14). At times, Thompson identified himself as a Vice President of PBD and he often entered into agreements and contracts on behalf of PBD in this capacity. (*Id.* at ¶ 15; Def. Ex. B. (Thompson Dep. 18:20-19:5)). Thompson and Johnson further acknowledged that they were not responsible

---

[8] Gandy only objects that the agency relationship involving Thompson and PBD terminated after the PSP was cancelled.

for the debts of PBD – except those they voluntarily paid – further evidencing the existence of an agency relationship between them and PBD.

Viewing the record in light most favorable to Plaintiffs, there is no direct evidence of any promises made by Dunkin' to Thompson or Johnson in their individual capacities concerning the business relationship with Dunkin'.[9] *See Guerra*, 27 A.3d at 1292. Rather, the evidence overwhelmingly points to a relationship between PBD and Dunkin' whereby PBD would build a commissary and Dunkin' would direct its franchisees to purchase fresh donuts and other baked items from PBD after the facility was completed. Such arrangement and the corresponding details were merely communicated to PBD through its agent, Thompson, who admittedly had routine and extensive communications with Dunkin' and its own agents. The extensive nature of these contacts undermines Thompson's position that he was promised anything individually and there is no record support for any asserted promise made individually to Johnson by Dunkin'. *See Massaro Ltd. Partnership (Park West Two) v. Baker & Taylor Inc.*, 161 F. App'x 185, 189 (3d Cir. 2005) ("If anything, Massaro's relationship with B & T militates against enforcement."). The record evidence fully supports this conclusion, with numerous references to Thompson acting on behalf of PBD throughout these dealings rather than in his personal capacity. For example:

- At the outset of the project in the summer of 2006, Thompson presented Jim Green with a Letter of Intent on behalf of PBD stating that "PBD's intent is to enter into a relationship with Dunkin' Brands." (Docket No. 117 at DBI 3);

---

[9]     The Court notes that F&J was formed by Johnson and Lak in July 2007 to replace PBD in the PSP. (Docket Nos. 101 at ¶ 53; 104 at ¶ 42). The record shows that in May 12, 2007, Gandy was no longer participating in the PSP. (Docket Nos. 101 at ¶¶ 49, 52; 104 at ¶¶ 37, 41; Ex. A (Thompson Dep. 130:17-20); Ex. E (Gandy Dep. 104:1-12)). However, from May 2007 until August 2007 Dunkin' continued to do business with PBD. This is further evidence that Dunkin' never made any promises to Plaintiffs.     (Docket Nos. 109 at ¶ 5; 119 at ¶ 5).

- Dunkin' obtained a credit application from PBD's principal, Gandy, not Thompson, when it was considering using PBD's Kelly Street site as a commissary. (Docket No. 117 at DBI 12);

- The potential loan from the URA was to be obtained by PBD, not Thompson. (Docket Nos. 109 at ¶ 4; 119 at ¶ 4; 117 at ¶¶ DBI 00094-95);

- The documents that Dunkin' presented to Thompson, including the ABMA were addressed to PBD. (Def. Ex. O; Docket Nos. 109 at ¶ 5; 119 at 5);

- The ABMA expressly states at § 24 that "no third party beneficiaries" were created by the agreement, which was solely for the benefit of the parties (i.e., Dunkin' and PBD). (*ABMA* at § 24);

- The purpose of the February 15, 2007 meeting between Thompson, Gandy and several Dunkin' employees was to determine the next steps for the "PBD" east facility (Docket No. 119 at ¶ 8);

- Thompson entered into numerous third party contracts with subcontractors in PBD's name, including the contracts with Marvin Miller, Hanson Design and LR Kimball (Docket No. 114 at 5, 9);

- Thompson executed checks and other relevant documents as Vice President of PBD, not in a personal capacity;

- On July 16, 2007, Joseph Koudelka pointed out to Scott Murphy that PBD, not Thompson, would be "spending big money soon", in pursuit of the PSP. (Docket Nos. 109 at ¶ 17; 119 at ¶ 17); and,

- Also in July, Michael Orie, a representative of Heartland, told Dunkin' that Heartland wanted Dunkin' to be the ones to inform PBD that frozen donut process was available (Docket Nos. 109 at ¶ 20; 119 at ¶ 20).

The claims for damages against Dunkin' asserted by Plaintiffs likewise undermine their position that Dunkin' promised them anything individually. In this regard, Thomson claims that he is entitled to $400,000 in consulting fees which were allegedly due to him from PBD and Gandy

but were not paid because the deal with Dunkin' was not completed. (Docket No. 101 at ¶ 104). Johnson also cites a water bill that he paid on behalf of PBD but cannot point to any evidence in the record which demonstrates that he paid such debt based on any promises made to him by Dunkin'. (Docket No. 101 at ¶¶ 184-187). Both Thompson and Johnson likewise seek to recover from Dunkin' funds that they allegedly advanced to PBD during the pursuit of the project. (Docket No. 101 at ¶¶ 143, 164).

With respect to F&J's claim, there is no genuine dispute of material fact precluding summary judgment given the absence of an actionable promise to F&J because, at most, Dunkin' agreed that it would continue with the PSP in the event that F&J bought out PBD and was assigned its position as an approved bakery manufacturer under the ABMA and this contingency never came to fruition. (Docket No. 101 at ¶ 54). The undisputed evidence shows that Thompson and Johnson engaged in negotiations with Gandy for F&J to purchase PBD but the deal failed to materialize because Gandy refused to go forward with the sale. (Docket Nos. 101 at ¶¶ 57, 58; 123 at ¶¶ 57, 58; 104 at ¶ 43; 115 at ¶ 43). In fact, Plaintiffs admit that Dunkin' refused to enter into a new ABMA agreement with F&J. (Docket Nos. 101 at ¶ 54; 123 at ¶ 54). Further, F&J was not even formed until July of 2007 and thus could not have received and relied on any prior promises made by Dunkin' to PBD or anyone else. *See Selzer v. Dunkin' Donuts, Inc.*, Civ. A. No. 09-5484, 2013 WL 4547812, at * 6 (E.D. Pa. Aug. 28, 2013) ("Yowza Enterprises was not even formed at the time the alleged promises were made, so Yowza Enterprises could not have received and relied on those promises to its detriment."). Accordingly, the fact that the transaction between F&J and PBD was not consummated was not the fault of Dunkin' because the contingency underlying its alleged promise to F&J was never performed by Plaintiffs.

To conclude, after viewing the record in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs have failed to meet their burden to present sufficient evidence to raise a genuine dispute of material fact on the necessary element of their promissory estoppel claim that Dunkin' made any express promises to them. In addition, none of the relevant documents, including the Letter of Intent,[10] the hypothetical ten year pro forma, or ABMA, contain any express promises to the Plaintiffs but rather evidence a relationship which was at all times between Dunkin' and PBD. (*See* Def. Ex. O; Docket No. 117 at DBI 3). Hence, any purported promise that Plaintiffs read into or assumed from this relationship would constitute, at most, a vague or implied promise based on the Plaintiffs' own judgments, not the express representations of Dunkin'. *See C & K Petroleum Products*, 839 F.2d at 192 ("Promissory estoppel would be rendered meaningless if this Court were to allow [a party] to maintain an action for detrimental reliance based on the alleged existence of such a broad and vague implied promise."). This is insufficient as a matter of law to sustain a claim for promissory estoppel, *id.*, as it is well settled that "there can be no justifiable reliance without an express promise." *TES Franchising, LLC v. Dombach*, Civ. A. No. 19017, 2010 WL 5071472, at *11 (E.D. Pa. Nov. 24, 2010) (citations omitted). Thus, Plaintiffs have failed to present sufficient evidence to support their promissory estoppel claim.[11]

For these reasons, Dunkin's Motion for Summary Judgment [99] as to Plaintiffs' promissory estoppel claim is granted and the Plaintiffs' Motion for Partial Summary Judgment [105] is denied.

---

[10] Again, the Letter of Intent setting forth the potential parameters of the PSP was drafted by Thompson on behalf of PBD and was never executed by any Dunkin' representative. (Docket No. 117 at DBI 3).

[11] To the extent that any promises were made to Thompson, Johnson, F&J, or the Plaintiffs collectively, the Court alternatively holds that no reasonable jury could determine that Plaintiffs could have reasonably relied on such promises, for the same reasons set forth in § V.B.iii, *infra*, with respect to Dunkin's Motion for Summary Judgment as to PBD's promissory estoppel claim.

iii.    <u>Reasonable Reliance</u>

The Court now turns to Dunkin's Motion for Summary Judgment challenging the sufficiency of the evidence supporting PBD's promissory estoppel claim on the basis that PBD's proof fails to establish that it reasonably relied on any promises made to it by Dunkin'. (Docket No. 103). PBD argues that its evidence is sufficient to establish this element of its claim and that there are genuine disputes of material fact in the record which preclude the entry of summary judgment. (Docket No. 114).

In order to sustain a claim for promissory estoppel, a plaintiff must show that "the promisor ha[s] an objectively reasonable belief that a purported promise will induce action by the promisee." *Burton Imaging Group v. Toys ""R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007). Reasonable reliance cannot be established by evidence that a sophisticated individual made a decision based on his own business judgment rather than relied on an express promise by the promisor. *Id.* Whether a party acted reasonably in response to a promise is usually a factual question reserved for the jury at trial. *See Dilworth v. Metro. Life Ins. Co.*, 418 F.3d 345, 354 (3d Cir. 2005) (quoting *Tran v. Metropolitan Life Insurance Company*, 408 F.3d 130, 139 (3d Cir. 2005)). However, if there are no genuine disputes of material fact on the issue of reasonable reliance, it may be decided as a matter of law by the court. *See Massaro*, 161 F. App'x at 189.

The main thrust of Dunkin's arguments against PBD relies on the numerous admissions made by Thompson during his deposition concerning his beliefs that Dunkin' never intended to go through with the PSP, which are discussed at length in the context of Dunkin's Motion to Strike above. (Docket No. 103). Dunkin' suggests that in light of PBD's agency relationship with Thompson, any actions taken in reliance on promises made by Dunkin' were inherently unreasonable and solely based on Thompson's exercise of business judgment, rather than any

purported promises made by Dunkin'. (*Id.*). PBD challenges Dunkin's reliance on Thompson's testimony to secure summary judgment based on its interpretation of Rule 32(a)(3) of the Federal Rules of Civil Procedure that Thompson's testimony cannot bind the company because he no longer was an agent at the time and additionally counters that Thompson never communicated his apparent beliefs to Gandy. (Docket No. 114). Dunkin' responds that PBD misinterprets Rule 32(a)(3) and that Thompson's admissions are both appropriately considered by the Court and fatal to PBD's claims. (Docket No. 128).

At the outset, the Court is unpersuaded by PBD's attempt to avoid Thompson's admissions due to the fact that he was no longer an agent of PBD at the time of his deposition. Rule 32(a)(3) provides that "[a]n adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee." FED. R. CIV. P. 32(a)(3). Such Rule generally governs the use of depositions against a party at trial, rather than at the summary judgment stage. *See Collins v. Omega Flex, Inc.*, Civ. A. No. 08-1422, 2010 WL 2470944, at *3 (E.D. Pa. Jun. 15, 2010). When given effect, Rule 32(a)(3) precludes an opposing party from presenting the deposition of a party or its agent *at trial* as opposed to calling such individual to provide direct testimony. *Id.* In contrast, Rule 56(c) plainly permits the parties to present deposition testimony of any witness and the Court to consider same in resolving motions for summary judgment. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: … (A) citing to particular parts of materials in the record, including depositions …"); *see also Palm Bay Imps., Inc. v. Miron*, 55 F. App'x 52, 57 (3d Cir. 2002) (holding that "a deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible, even though the conditions of the rule on use of a deposition at trial are not satisfied."). Accordingly,

Rule 32(a)(3) does not support PBD's efforts to have the Court disregard Thompson's testimony and the Court will consider same pursuant to Rule 56(c).

In any event, PBD's primary contention appears to be that Thompson was not in a position to bind PBD at the time of his deposition. (Docket No. 114). While this assertion is factually correct because Thompson no longer worked for PBD at the time of his deposition, it does not preclude the Court from entering summary judgment against PBD in this case because there are no genuine disputes of material fact in the record showing through clear and convincing evidence that PBD reasonably relied on any promises made to it by Dunkin'.

Again, Thompson testified at length concerning his knowledge of the situation at the time of the dealings with Dunkin' and his belief that Dunkin' never intended to carry through with the PSP or its purported promises to PBD. (Docket No. 101 at ¶¶ 27-28). PBD admits that Thompson was acting as its agent and was authorized to act on its behalf in connection with Dunkin' during the events in question. (Docket Nos. 104 at ¶¶ 8-9; 115 at ¶¶ 8, 9). PBD also concedes that Thompson ran PBD's day-to-day operations, was the point person for PBD in its dealings with Dunkin' and that its principal, Gandy, deferred to Thompson's superior business acumen. (*Id.*). Gandy even acknowledges that Thompson signed his (Gandy's) name on the ABMA with Dunkin' as well as other documents in furtherance of the PSP. (Docket No. 115 at ¶ 28). Although PBD contends that Thompson never conveyed any skepticism to Gandy and expressed confidence that the PSP would be carried out, (Docket Nos. 101 at ¶ 24; 104 at ¶ 12; 116 at ¶¶ 2-3), it is well settled that "knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal." *See Good Will Hunting Club, Inc. v. Resources-Appalachia, LLC*, Civ. A. No. 11-1152, 2013 U.S. Dist. LEXIS 74055, at *31 (M.D. Pa. May 24,

2013) (quoting *W.C.A.B. v. Evening Bulletin*, 445 A.2d 1190, 1192 (Pa. 1982)); *see also V-Tech Servs., Inc. v. Street, et al.*, 72 A.3d 270, 279 (Pa. Super. Ct. 2013) (same). Thus, Thompson's testimony concerning his knowledge and belief of the circumstances surrounding Dunkin's lack of any real intent to move forward with the PSP can be fairly imputed to PBD because Thompson was its agent at the time of the events in question and the only person who could have obtained such knowledge. (Docket No. 104 at ¶¶ 8-9 ("[PBD] was my business, but I entrusted it to Charles Thompson. He was the one that did everything. I really didn't stay on top of it because I trusted him.")).

In all, the Court finds that Thompson's testimony leaves no room for doubt that he never truly believed that Dunkin' intended to complete the PSP and there are no genuine disputes of material fact on this issue. (Def. Exs. A, B, C). Since PBD's agent, Thompson, knew that the PSP was likely to fail "right at the beginning," PBD's decisions to press forward with the commissary project were made based on Thompson's (and Gandy's) independent business judgment rather than reasonable reliance on any promises made by Dunkin'. Further, all of the relevant documents in the case, i.e., the ABMA, hypothetical pro forma, and the revised PCA, contain express disclaimers diminishing any legitimate argument that Dunkin' was promising that: (1) its franchisees would make any purchases from PBD of baked goods; (2) PBD would have an exclusive territory or service area; (3) PBD would generate any volume of revenues from sales of baked goods to Dunkin' franchisees; and, (4) any entity (such as Heartland) would commit to purchase any goods from PBD without having first entered into a franchisee (or Store Development) agreement with Dunkin'. *See e.g.*, *Luther*, 676 F. Supp. 2d at 408; *Josephs*, 733 F. Supp. at 227 ("there can be no estoppel when the plaintiffs' actions were based on their own will and judgment rather than the defendant's representations."); *Burton Imaging Group*, 502 F.

Supp. 2d at 439 ("businesses may not rely merely on their own interpretation of the legal significance of a promise."). It was not objectively reasonable for PBD to rely on Dunkin's promises due to Thompson's testimony on these issues and the disclaimers in the documents. *See id.* Therefore, PBD cannot establish by clear and convincing evidence that its actions in furtherance of the PSP were undertaken in reasonable reliance on any promises made by Dunkin'.

Dunkin' alternatively argues that, even if the evidence is deemed sufficient to support the element of reasonable reliance, PBD's promissory estoppel claim must fail because it cannot show that it underwent a substantial change in position in furtherance of the purported promise. (Docket No. 103). In order to succeed on a promissory estoppel claim, the plaintiff must also establish that the action it took in reasonable reliance on the promise "amounted to a substantial change of position." *Luther*, 676 F. Supp. 2d at 408 (citing *Ankerstjerne v. Schlumberger Ltd.*, 155 Fed. Appx. 48, 51 (3d Cir. 2005). If the alleged promise is conditional in nature, proof of a substantial change in position requires a showing that the plaintiff took substantial steps to perform the necessary condition prior to enforcement. *See Kaufman v. Mellon Nat. Bank & Trust Co.*, 366 F.2d 326, 333 (3d Cir. 1966) ("The defendant's promise was in substance a conditional offer made without consideration. Until such time as the plaintiffs entered upon performance or substantially changed their position in reliance on the promise, the offer was revocable.").

The allegations made by PBD in the instant case are in some ways similar to those made in *Selzer v. Dunkin' Donuts, Inc.*, Civ. A. No. 09-5484, 2013 WL 4547812, at * 6 (E.D. Pa. Aug. 28, 2013), where the United States District Court for the Eastern District of Pennsylvania granted summary judgment on behalf of Dunkin' on a promissory estoppel claim. The *Selzer* case

involved individual and corporate employees who had entered into a Store Development Agreement with Dunkin'. *Id.* An entity was formed for the purpose of purchasing a parcel of real estate which plaintiffs hoped to develop into a Dunkin' retail store. *Id.* The plaintiffs contended that Dunkin's Director of Development verbally approved the site and later reassured them that the site would become a Dunkin' store. *Id.* Dunkin' eventually terminated the deal and plaintiffs sued. *Id.*

The plaintiffs argued that they made a substantial change in position by continuing development on the site with the belief that it would become a Dunkin' store. *Id.* However, the Court rejected their claim because the plaintiffs were not able to point to any evidence regarding precisely what development activities were complete after the promises were purportedly made by Dunkin' and the evidence demonstrated that they intended to develop the property regardless of any deal with Dunkin' such that the preparatory work on the site would have been completed. *Id.* The Court also held that the plaintiffs failed to present evidence of any alternative development opportunities that they declined to pursue during the deal with Dunkin' or that they acted any differently because of Defendant's promises. *Id.* Therefore, the Court found that the plaintiffs failed to demonstrate a substantial change in position and granted Dunkin's motion for summary judgment in that case. *Id.*

In another analogous case, *Luther v. Kia Motors America*, 676 F. Supp. 2d 408 (W.D. Pa. 2009), the Court held that a prospective franchisee could not demonstrate a substantial change in position by clear and convincing evidence. There, the plaintiff admittedly presented some evidence that it entered into commitments to complete a franchise package in furtherance of its franchise application but presented no evidence that the time and money spent pursuing the deal

was diverted from some other business opportunity. *Id.* Accordingly, summary judgment was entered in favor of defendant. *Id.*

Here, PBD claims that it reasonably relied on promises made by Dunkin' in pursuing the PSP and it is uncontested that the goals of the PSP were for PBD to build a commissary and Dunkin' would then direct its franchisees to purchase donuts and other baked goods from PBD. (Docket No. 114). But, the record is undisputed that PBD was not in a position to complete many of the conditions necessary for it to perform under this arrangement when Dunkin' terminated the relationship. For example, PBD never obtained the loan from the URA which – according to Thompson – was a prerequisite to completing the commissary facility. (Docket Nos. 101 at ¶¶ 49, 52; 104 at ¶¶ 37, 41; 117 at DBI 94-95, 173-174). Further, Thompson advised Dunkin' in May of 2007 that Gandy's financial condition precluded his continued pursuit of the loan and the PSP. (*Id.*). As a consequence, F&J attempted to purchase PBD from Gandy but the parties could not agree to terms. (Docket Nos. 101 at ¶ 58; 123 at ¶ 58; 104 at ¶ 43; 155 at ¶ 43). In addition, only preliminary plans for the first site for the commissary on Kelly Street were prepared, without the occurrence of any construction, and the second site on Braddock Road was leased from a third party, but there is no evidence that significant construction was completed to prepare the building as a commissary under the PSP.[12] At most, demolition may have occurred. So, while the record is undisputed that third party contractors were engaged by PBD to perform some services in support of the commissary project, the evidence is uncontested that PBD was neither financially capable of obtaining a necessary loan to complete the construction nor prepared to complete the construction at the time the PSP was cancelled by Dunkin' in August of

---

[12] To this end, the parties dispute whether some demolition work was commenced. (Docket Nos. 109 at ¶ 15; 119 at ¶ 15). However, it is also uncontested that the landlord did not pursue any legal action against PBD or Gandy and the lease was not enforced after the PSP was terminated. (*Id.*).

2007. *See Kaufman*, 366 F.2d at 333. Hence, there is not clear and convincing evidence of a substantial change of position by PBD in reliance on the promises made by Dunkin'.

The Court further recognizes that the purpose of a promissory estoppel claim is to avoid injustice by making otherwise unenforceable agreements binding on parties. *See Guerra*, 27 A.3d at 1292. However, promissory estoppel "is not designed to protect parties who do not adequately memorialize their contracts in writing." *Massaro*, 161 F. App'x at 188-89 (quotation omitted). In this case, Dunkin', at most, agreed to direct its franchisees to purchase donuts and other baked goods from PBD if it built and started operating the commissary but such agreement was never memorialized in writing. (Docket No. 105). Yet, PBD is attempting to recover debts allegedly owed to third parties resulting from its attempts to perform under the PSP when there is no evidence in the record that Dunkin' ever agreed to pay the types of construction costs, leases and any other development costs which were necessary for PBD to build the facility. Further, all of the evidence of record demonstrates that PBD was not capable of performing its end of the bargain at the time the PSP was cancelled.

In this Court's estimation, the present situation resulted from the fact that PBD, through Thompson, took calculated business risks to pursue the commissary project in furtherance of the potential profits which may have been generated through sales to Dunkin's franchisees after the commissary was completed. Like many business deals involving sophisticated entities and businesspeople, this project failed. *See e.g.*, *Cranberry Promenade, Inc. v. Cranberry Twp., et al.*, Civ. No. 09-1242, 2011 U.S. Dist. LEXIS 149222, at *123 (W.D. Pa. Dec. 29, 2011). To the extent that PBD only desired to pursue the PSP and the commissary project if Dunkin' would cover its development and construction costs in the event of a termination, PBD took no steps to memorialize such terms in a legally binding agreement and shift the risk of such losses to

Dunkin'.  *See Massaro*, 161 F. App'x at 188-89 ("Had it wished to rely on Benjamin's assurance that board approval was a 'mere formality' and that B & T was committed to leasing the premises, it could have bargained to have this language included in the LOI.").  Even the initial Letter of Intent presented to Dunkin' by PBD makes no mention of Dunkin' having any responsibility for such costs and the record is clear that Dunkin' made no such assurances. (Docket No. 117 at DBI 3).  Thus, the tenets of equity do not demand that the promises by Dunkin' should be enforced because no injustice results when a party relies on its own business judgment to pursue a potential business opportunity and ultimate success in the endeavor is not achieved.  *See e.g.*, *Luther*, 676 F. Supp. 2d at 408; *Josephs*, 733 F. Supp. at 227; *Burton Imaging Group*, 502 F. Supp. 2d at 439.

For these reasons, Dunkin's Motion for Summary Judgment as to PBD's Third Amended Complaint [102] is granted.

VI. CONCLUSION

Based on the foregoing, Dunkin's Motion for Summary Judgment on Plaintiffs' Second Amended Complaint [99], Motion for Summary Judgment on PBD's Third Amended Complaint [102], and Motion to Strike [132] are GRANTED and Plaintiffs' Partial Motion for Summary Judgment [105] is DENIED.  An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge


Date:   June 30, 2014

cc/ecf:  All counsel of record.